776 So.2d 1134 (2000)
STATE of Louisiana
v.
Dan L. BRIGHT.
No. 98-KA-0398.
Supreme Court of Louisiana.
April 11, 2000.
*1136 G. Benjamin Cohen, Marie J. Scavetta, Albany, N.Y., Clive Adrian Stafford-Smith, New Orleans, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Harry F. Connick, District Attorney, Catherine Lynn Bartholomew, Richard Rowland Pickens, II, New Orleans, Valentin Michael Solino, Counsel for Respondent.
CALOGERO, Chief Justice.[*]
The defendant, Dan L. Bright, was convicted of first degree murder and sentenced to death for the killing of Murray Barnes on Super Bowl Sunday in 1995. After enjoying the football game that evening, Barnes arrived at Creola's Bar on Laussat between Press and Montegut Streets in New Orleans to discover that he had won $1,000.00 in the bar's football pool. Genora Bickham, the barmaid, handed him his winnings in two envelopes each containing $500.00. In apparent good humor, Barnes generously tipped Bickham and treated his friends to a round of drinks. After the celebrations, Barnes, his cousin Freddie Thompson, and his friend Kevin Singleton left the bar. Outside Creola's, Thompson pointed down the block to a woman who had asked for Barnes a few minutes earlier. Barnes called out "Chris" to the woman, who *1137 looked towards him, but then turned around and continued walking away. Ignoring this seeming rebuff, Barnes and his friends proceeded to Barnes's truck parked across the street. As Barnes was standing at the driver's door, two men, whom Thompson had earlier seen conversing with the woman named "Chris," appeared from out of the alley and took Barnes by surprise. One of the men, who was wearing a grey sweat suit and was later identified as the defendant, shot Barnes twice in the back and once in the arm. The two assailants then immediately fled toward Montegut Street. The wounded Barnes returned to Creola's, where he collapsed on the floor of the bar. Barnes died en route to the hospital, his lucky day having come to an abrupt and tragic end. An investigation produced only one of his envelopes of winnings, that containing $444.00.
An Orleans Parish grand jury indicted the defendant and Christina Davis in April of 1995 for the first degree murder of Barnes, a violation of La.Rev.Stat. 14:30. Before trial, the cases were severed. After trial of this defendant, Bright, in July of 1996, jurors found him guilty as charged and, after finding two statutory aggravating circumstances under La.Code Crim. Proc. art. 905.4(A), recommended imposition of the death penalty. The jury found that, at the time of the killing, the offender was engaged in the perpetration or attempted perpetration of an armed robbery, La.Code Crim. Proc. art. 905.4(A)(1), and that the offender had been previously convicted of an unrelated armed robbery, La. Code Crim. Proc. art. 905.4(A)(3). The district court denied the defendant's motion for post-verdict judgment of acquittal and motion for new trial. Thereafter, the district court sentenced the defendant to death.[1] The defendant now appeals.
For the reasons that follow, we set aside the defendant's first degree murder conviction and death sentence. Because we find the record supports a conviction of the defendant for second degree murder, we modify the jury's verdict of guilty of first degree murder and render a judgment of guilty of second degree murder. La.Code Crim. Proc. art. 821(E). We therefore remand the case to the district court for sentencing of the defendant to serve life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence, as provided by La.Rev.Stat. 14:30.1.

FACTS
Shortly before midnight on January 29, 1995, Barnes parked his truck directly across from Creola's Bar located in the Ninth Ward at 2904 Laussat. Barnes and Singleton crossed the street and entered the bar. As Thompson waited in the truck, he noticed a woman and two men conversing at the corner of Laussat and Montegut, on the same side of the street as Creola's, about a half block away. As Thompson watched, the two men moved to the middle of Laussat Street and began walking in his direction. They walked as far as Creola's, then turned around and retraced their steps to the corner. Thompson observed that both men wore sweat suits with hoods, one grey and one blue. When the man dressed in grey passed nearer to the truck, Thompson made eye contact with him. About the time that the men returned to the corner, Singleton opened the front door of the bar and yelled to Thompson that Barnes had won and to come in for a drink. As Thompson was walking towards the bar, the woman who had been conversing at the corner with the two men approached Thompson and asked that he tell the driver of the truck that she wanted to see him. Thompson ignored her and proceeded to *1138 the bar. Inside the small establishment, Thompson saw the woman again. She had come in behind him, walked slowly around the room, and then left. Thompson thought it odd that she did not speak to Barnes, since she had just told Thompson to tell Barnes that she wanted to talk with him.
Shortly thereafter, Barnes, Thompson, and Singleton left the bar and walked to the truck. Thompson was entering the passenger side when he spotted the woman on Laussat on the other side of Montegut, walking away. He directed his cousin's attention to her. Barnes looked and shouted, "Hey, Chris." The woman paused, looked back, but then turned around and resumed walking away. Barnes continued around back of the vehicle to the driver's side. Thompson and Singleton were in the cab of the vehicle and Barnes was about to open the driver's door when the two men ran out of an alley and confronted him on the sidewalk.
Thompson recognized the assailants as the same two men he had seen earlier at the corner and walking in the middle of Laussat. The one in grey held a gun in his right hand. Just before the gunman started firing, Thompson heard Barnes exclaim, "What?" Singleton heard the gunman say one unintelligible word, to which Barnes replied, "What's up with that?" The gunman fired his weapon and shot Barnes, who then ran around the back of his truck toward Creola's and entered the bar through a side door. Thompson and Singleton, who were unharmed, ran after him. When Barnes ran toward the rear of his truck, the assailants took off in the opposite direction toward Montegut Street and turned right on to Montegut. As the assailants reached the corner, they fired two more shots in the air. Inside the bar, Barnes told the barmaid that he had been shot and to call the police. Barnes then collapsed.
Thompson and Singleton left the scene in the victim's truck to alert family members. As a result, police parked in the spot where the victim's truck had been at the time of the shooting. The first officers to arrive found the victim on his back on the floor of the bar, unconscious. Thompson and Singleton returned with Barnes's aunt in time to see Barnes being carried out of the bar on a stretcher. They remained on the scene and gave statements to investigators. Thompson stated he could identify the shooter as well as the woman. He described the shooter as 5'6" or 5'7" tall, light-skinned, weighing 140 pounds, and wearing a grey sweat suit with a hood. Singleton told police that he doubted he could identify anyone.
Barnes was shot three times. Two bullets hit his back in the upper torso region, and the third struck the back of his left arm. One bullet punctured a lung and ruptured an artery, precipitating substantial internal bleeding, unconsciousness, and ultimately death. Based on the trajectory of the bullets in Barnes's body, the forensic pathologist who performed the autopsy stated that the wounds were consistent with a right-handed shooter standing behind the victim and slightly to the victim's right. The murder weapon was never recovered.[2]
There were no leads in the case for several weeks until NOPD Detective Arthur Kaufman received information implicating Dan Bright, Christina Davis, and her cousin, Tracey Davis. The detective compiled photographic arrays and displayed them to Freddie Thompson, who identified the defendant Bright as the shooter and Christina Davis as the woman who had spoken to him shortly before the shooting. He could not identify Tracey Davis. Christina Davis was arrested on *1139 February 20, 1995; the defendant surrendered to police on March 8, 1995.
At trial, the prosecution theorized a specific intent homicide committed during the course of an armed robbery or attempted armed robbery. The victim had been shot down minutes after collecting $1,000 on a Super Bowl pool. He had not known that he had won until told by the barmaid, Genora Bickham. She gave him the news and handed him two sealed envelopes, each containing $500. He opened one, bought a round of drinks for the house, and tipped Bickham $40. He also gave Thompson $10. Within seconds of leaving the bar, Barnes was ambushed and killed. Freddie Thompson thought that there "[m]ay have been" talk around the bar that night that his cousin had won big. As only one envelope, already opened and containing but $444 and change was found on Barnes, the State argued that robbery obviously had been the motive for the attack. The prosecution, therefore, postulated that Christina Davis had "scoped it out," that "[she] saw who the winner was, knew who the winner was," and identified him for the defendant and his accomplice, who were lying in wait near the victim's truck to ambush him. During its case-in-chief, the state called Thompson, who related the events surrounding the killing and identified the defendant as the shooter and Christina Davisafter she was brought into the courtroom and exhibited to the juryas the woman who had spoken to him about Barnes. The State also called Singleton, who similarly recounted the events surrounding the murder but who could not make an identification.
The defense's primary theory of the case was misidentification, but trial counsel alternatively argued to jurors that whoever committed the killing did not do so during the commission or attempted commission of an armed robbery. The defense presented two witnesses who offered exculpatory testimony even while placing the defendant on Montegut Street just around the corner from Creola's Bar at the pertinent time. One witness was Shelita Christmas, who had known the defendant for seven years and who was the mother of two of his children. The other was William "Yam" Thomas, who was a long-time friend of defendant's parents and had watched the defendant grow up. Christmas and Thomas testified that the defendant was standing at the gate of Thomas's home on Montegut Street when shots rang out. The defense witnesses next saw two men running, rounding the corner at Laussat and passing by them as the men continued on Montegut Street.
According to Christmas, she and the defendant had stopped to visit Thomas. The defendant had just knocked at Thomas's gate when gunfire rang out. Almost immediately Christmas saw two men dressed in black running from Laussat onto Montegut Street, one with a hood over his face. She recognized one as Tracey Davis; she believed the other was Tracey's cousin, Henry.
Christmas testified that the defendant always wears glasses and has worn a moustache as long as she has known him. She also testified that the defendant is left-handed and that, on Super Bowl Sunday, he had an "Ace band cast" on his left hand. Earlier, during cross-examination of state forensic pathologist Dr. Paul McGarry, defense counsel had handed the witness an x-ray, purported to be of Dan Bright and dated January 18, 1995, and asked if it showed a fracture of the left hand. Dr. McGarry agreed that it did indeed reflect a recent fracture of a metacarpal bone in the left palm at the base of the index finger in the process of healing with some displacement. Dr. McGarry believed that a set of numbers in the upper corner of the x-ray ("180195") referred to the date the x-ray was taken, January 18, 1995. Christmas testified that she had caused this injury and that she was present when the x-ray was taken and the cast put on the defendant.
Thomas testified that he often received night-time visits from the defendant. He *1140 confirmed Christmas's and the defendant's presence in front of his 2829 Laussat Street home around midnight on January 30, 1995. He had been expecting defendant around 8 or 9 p.m. but, when it got later, Thomas locked the gate. Around midnight he was in the bathroom when he heard knocking and the defendant calling him. Then he heard gunfire. At that, the defendant began yelling to hurry and open up, that someone was shooting. As Thomas reached his front door, which opens onto Montegut, he saw two men running across his driveway as they ran down the street, both holding what appeared to be pistols. One had a jacket with a hood with a white symbol, like a Dallas Cowboys jacket. The other was in dark clothes. Thomas could not say how the defendant was dressed that night, because the defendant ran back to his car and never entered the house. Elsewhere, Thomas related that defendant usually wore glasses and, that night, had his left hand in a cast close to his chest as if in a sling. He stated that the defendant had only recently begun wearing a moustache.
The credibility of these alibi witnesses, however, was damaged on cross-examination. Christmas, who said she and the defendant were planning to marry, was impeached with an affidavit she had given to defense counsel in April of 1995 recounting a different set of events on Super Bowl Sunday preceding a visit to someone other than William Thomas. Her testimony on direct indicated that she had been with the defendant at his hotel and that they were returning to the hotel when they stopped by William Thomas's home on Montegut. On cross-examination, she was confronted with the affidavit, in which she had stated that the defendant had picked her up on the street that night and was bringing her to her home on Desire Street when they stopped on Montegut to see his friend Dennis. She then explained that she had been at a friend's house while she "supposed" that the defendant had been at his hotel watching the football game. She also explained that she had been confused over the name of the defendant's friend when she gave the affidavit, but she maintained that it was "Yam" instead of "Dennis" whom she and the defendant had visited. In the affidavit, she had stated that Thais "Fish" McKay, who did not testify, had come to the door, whereas on direct-examination she stated that Thomas had come to the door when the defendant appeared at the gate of the house. Christmas suffered a further loss of credibility when a prior drug conviction was revealed, which, she contended, resulted from police planting the narcotics on her.
Thomas, who had known the defendant for ten or twelve years, denied that the defendant's family had sought out his testimony. Explaining why he was coming forward for the first time at trial, he stated that when the defendant was arrested he knew he had to step up because "the wrong man g[ot] charged ... because I'm looking right at him [at the time of the shooting]. If any murder occurred, this man that I'm looking at didn't do it." Thomas admitted that he had prior convictions for theft and possession of stolen goods in 1959 and for illegal carrying of a weapon in 1976. He also disclosed that a year-old charge for possession of heroin with intent to distribute was pending at the time of trial.
After deliberating for approximately two hours, the jury unanimously returned a verdict of guilty of first degree murder, having necessarily determined that the defendant possessed the requisite specific intent to kill or to inflict great bodily harm upon Barnes while the defendant was engaged in the commission or attempted commission of an armed robbery.

LAW and DISCUSSION
On appeal, the defendant asserts seventy-three assignments of error nominally divided into thirteen arguments. Because this court vacates the defendant's death sentence and reduces the conviction to second degree murder for the reasons given hereafter, we find it unnecessary to address *1141 any assignments of error relating to the penalty phase of trial. Only certain assignments of error are considered below. The remaining assignments, non-meritorious and governed by settled principles of law, are addressed in an unpublished appendix, which is attached to this opinion and is part of the official record in the case.

I.
We commence our discussion with the defendant's meritorious contention that the State presented insufficient evidence of an armed robbery or attempted armed robbery. To convict the defendant of first degree murder in this case, the State was required to prove the following elements beyond a reasonable doubt: (1) the defendant had the specific intent to kill or to inflict great bodily harm, (2) while he was engaged in the perpetration or attempted perpetration of an armed robbery. La.Rev.Stat. 14:30(A)(1).
With regard to specific intent to kill or to inflict great bodily harm, the defendant makes no argument that the evidence is insufficient to prove the gunman actively desired the prescribed criminal consequences to flow from his actions. See La. Rev.Stat. 14:10(1). Freddie Thompson testified that the defendant, armed with a gun and standing just a short distance from the victim, shot Barnes three times in the back. On these facts, the jurors were certainly justified in finding that the defendant had possessed the requisite specific intent to kill or to inflict great bodily harm. See, e.g., State v. Tassin, 536 So.2d 402, 411 (La.1988).
However, the State was also required to prove the killing occurred during the commission or attempted commission of an armed robbery. Thus, to prove armed robbery, the State had to establish beyond a reasonable doubt that the defendant took something of value from the victim or from under the control of the victim, through the use of force or intimidation, while armed with a dangerous weapon. La.Rev. Stat. 14:64. To prove an attempt, the State was required to demonstrate that the defendant (1) specifically intended to commit the crime of armed robbery and (2) performed or omitted an act for the purpose of and tending directly toward the accomplishing of his objective. La.Rev. Stat. 14:27(A). Mere preparation to commit a crime is not sufficient to constitute an attempt, but lying in wait with a dangerous weapon with the intent to commit the crime is sufficient to constitute an attempt to commit the offense intended. La. Rev.Stat. 14:27(B). Specific intent is the state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La.Rev.Stat. 14:10(1).
The constitutional standard for evaluating the sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find that the State proved all the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When circumstantial evidence is introduced to prove the commission of a crime, La.Rev. Stat. 15:438 requires that "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." Under Jackson v. Virginia, all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Ortiz, 96-1609, p. 12 (La.10/21/97), 701 So.2d 922, 930.
At trial, the State, having conceded that proof of an armed robbery or attempted armed robbery was circumstantial, urged the jurors to convict on this line of reasoning: that $500 in the second envelope was missing from Barnes's person; that Christina Davis and the defendant knew that Barnes had won the pool; that they targeted Barnes and only Barnes for that reason; that the two perpetrators lay in *1142 wait to rob Barnes; that the defendant and his accomplice then held up Barnes; and that the defendant shot Barnes when he ran or refused to turn over both envelopes of money. The State argued that the motive for the killing was clear, because "everybody knew [that Barnes had] won the thousand dollars" and the perpetrators "went straight [for Barnes]."
The testimony at trial, however, does not distinguish this killing from a murder animated by personal grudge or vendetta, carried out on a public street, with the victim's death the sole purpose of the assault; nor does it foreclose the possibility that someone other than the assailants took the missing envelope. There was no evidence of a demand for the victim's winnings or anything else of value. Freddie Thompson did not hear the assailants say anything to his cousin before the gunman "just ... start[ed] shooting." Nor did he see them reach to take anything from his cousin or his cousin's pockets. The assailants instead "just went up, the one guy shot him, and they ran off." Kevin Singleton heard one unintelligible word from the gunman, who then "just fired" at his friend, apparently right after Barnes asked, "What's up with that?" Singleton, too, testified that neither assailant tried to take anything from Barnes or his pockets. They simply shot him, then "turned around and ran off." According to Singleton, the incident did not look like a robbery and was over in a matter of seconds.
Furthermore, we do not find that the evidence establishes that this was an aborted armed robbery.[3] No evidence suggested that Barnes resisted or attempted to flee before he was shot three times by the gunman. The assailants did not pursue the wounded Barnes, nor did they reach for his person. In fact, in the immediate wake of the shooting, the victim and perpetrators ran in opposite directions. The wounded Barnes ran toward the back of his truck, which took him in the direction of Press Street, while the assailants ran toward the front of the truck, which took them in the direction of Montegut Street. The victim circled behind his truck, crossed Laussat and reentered Creola's Bar through a side door. The perpetrators reached Montegut Street, fired two more shots, apparently in the air, turned right onto Montegut, and kept running.
Additionally, the evidence did not exclude the inference that someone other than the assailants had taken the missing envelope allegedly containing $500. Barnes collapsed inside the bar, where by then other patrons and employees were aware that Barnes had won the pool. Barnes, however, was left in the bar, apparently unattended and fatally wounded, while his cousin and friend took his keys and left to find other family members. Thompson testified that it had taken longer than they thought it would to return with Barnes's aunt. By the time they returned, police and emergency medical personnel were already on the scene. No testimony accounts for who did or did not have access to Barnes's person during that absence, or even thereafter.
In the absence of conduct by word or deed supporting an inference that the assailants intended a robbery, there is scant *1143 evidence to link the murder to the football pool. No evidence indicates that Barnes knew that he had won the pool before he reached Creola's. Nor did testimony from the barmaid Genora Bickham suggest that the winner's identity had been revealed to the bar's patrons prior to Barnes's arrival. Although Thompson reluctantly agreed with the prosecutor that there "[m]ay have been" talk around the bar that his cousin had won, any "talk" heard by Thompson could only have been "talk" that transpired after he had entered the bar. Thompson, however, entered the bar after Barnes was given his winnings, after he ordered drinks, and after Singleton had called out the pool results from the bar's front door to Thompson. Yet when Singleton opened the door to tell the news to Thompson, the two assailants had already completed their walk up and down Laussat Street past Thompson while he had been sitting in Barnes's truck and Davis was then asking Thompson about the truck's driver. Additionally, although Bickham testified that she had seen Davis since starting her shift at 4:00 p.m. that day, Bickham did not indicate whether she had seen Davis before the football game, during the game, or after the game, when the pool results would have been available. In sum, the evidence introduced at trial was such that the jury could only speculate as to whether Davis and the two assailants knew beforehand that Barnes had won and that he would be at the bar around midnight to check on the pool results and to collect his winnings.
Finally, even if Davis's behavior reasonably supports an inference that she both searched for the victim and identified him to the assailants, this conduct does not equate to evidence of an armed robbery or an intent to take something of value. The State's evidence did not foreclose other possibilities that may underpin the ambush and slaying or that may account for the missing money in a way unrelated to the shooting, as argued by defense counsel at trial. As we observed previously, this killing is indistinguishable from a murder animated by personal grudge or vendetta. Although Thompson and Singleton did not know Davis or the two men, Thompson's testimony establishes that Barnes and Davis knew each other. Yet, Davis's actions toward Barnes that night struck Thompson as peculiar. He testified that Davis, having earlier told him that she wanted to speak with Barnes, did not attempt to talk to Barnes when she came into the bar. Later, Thompson said, Davis again declined to speak with Barnes when Barnes called to her outside the bar. In short, the motive for the attack remains insolubly ambiguous, and jurors could only conjecture about what prompted it.
We conclude that the evidence introduced by the State necessarily required the jurors to speculate as to the motivation for the attack on Barnes and who might have taken the missing envelope allegedly containing $500. Although the due process standard of review under Jackson v. Virginia does not permit a reviewing court to substitute its own appreciation of the evidence for that of the jury, "`the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.'" State v. Mussall, 523 So.2d 1305, 1311 (La.1988) (quoting 2 Charles Alan Wright, Federal Practice & Procedure, Criminal 2d § 467 (2d ed.1982)); see also State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427; State v. Lubrano, 563 So.2d 847 (La.1990). In this case a rational trier, viewing the evidence in the light most favorable to the state, could only speculate as to whether there was an armed robbery, an attempted armed robbery, or something else, because the State's evidence, even viewed in a pro-prosecution light, did not exclude beyond a reasonable doubt the defense's hypothesis that this killing was not an armed robbery or attempted armed robbery, and thus not a capital offense. The evidence, therefore, cannot support the defendant's conviction for first degree murder.
*1144 However, under State v. Byrd, 385 So.2d 248 (La.1980), and La.Code Crim. Proc. art. 821(E), discharge of the defendant is neither necessary nor proper when the evidence does not support the verdict returned but does support a conviction on a lesser and included grade of the offense that has been legislatively authorized as a responsive verdict. State v. Ortiz, 96-1609, p. 20, 701 So.2d at 934; see also State v. Hart, 96-0697, pp. 16-17 (La.3/7/97), 691 So.2d 651, 661-62; State v. Bay, 529 So.2d 845, 846 (La.1988). Because we find that the evidence subjected to the standard of Jackson v. Virginia supports a conviction for specific intent second degree murder as provided in La. Rev.Stat. 14:30.1(A)(1), an authorized responsive verdict to the charge of first degree murder, see La.Code Crim. Proc. art. 814(A)(1), we vacate the defendant's conviction for first degree murder and sentence of death. Since, as will be seen hereinafter, there were no meritorious assignments of error and no prejudicial or erroneous rulings, we modify the judgment of guilty of first degree murder, render a judgment of guilty of second degree murder, and remand the case to the district court for sentencing on the modified judgment as set forth in La.Rev.Stat. 14:30.1(B).

II.
Under the rubric of insufficient evidence, the defendant challenges the in-court identification made by Freddie Thompson on a variety of grounds, many of which are interwoven with other assignments of error. He contends the identification by Freddie Thompson was unreliable and should have been suppressed. He also contends Thompson's eyewitness testimony is questionable and, therefore, this testimony, from a single eye-witness in a capital case, should not outweigh the defendant's alibi defense supported by physical evidence. He argues that prosecutorial misconduct contributed to a verdict based on insufficient evidence.[4]
We first address the question of whether the district court erred in denying the defendant's motion to suppress the identification. The defendant asserts that both in-court and out-of-court identifications made by Freddie Thompson were unreliable and should have been excluded. In support of his claim of misidentification, the defendant argues that no photograph in the array shown to Thompson weeks after the shooting matched Thompson's description of the gunman. He further maintains that he does not match Thompson's description of a right-handed, light-skinned African-American male, 5'6" or 5'7", about 140 pounds. The defendant claims he is medium- to dark-skinned, has a moustache, wears glasses, had a cast on his left arm at the time of the crime, is left-handed, stands 5'9", and weighs 140 pounds. He also argues that darkness and cloud cover precluded Thompson from clearly seeing the gunman, of whom Thompson gave a vague description.
Thompson was shown two photographic arrays of African-American males by Det. Kaufman eighteen days after the shooting. One array contained the defendant's picture, the other included a photo of Tracey Davis. Thompson picked the defendant's photograph from one array, but he did not recognize anyone in the other. At the suppression hearing, Det. Kaufman testified that no suggestions, threats, promises or inducements accompanied Thompson's selection of defendant's picture; the detective testified similarly at trial. Thompson testified that he was shown some pictures *1145 and that police made no suggestions to him, did not tell him there was a suspect among the photographs, and urged him just to look at the photographs. He selected the defendant's picture, signing the back and initialing the rest. The trial court denied the motion to suppress the identification. At trial, Thompson, after denying that the police made any suggestions, threats, or promises concerning the photographic line-up, made an in-court identification of the defendant as the gunman.
An identification procedure is suggestive if it unduly focuses a witness's attention on the suspect. State v. Neslo, 433 So.2d 73, 78 (La.1983); State v. Robinson, 386 So.2d 1374, 1377 (La.1980). Strict identity of physical characteristics among the persons depicted in a photographic array is not required; however, there must be sufficient resemblance to reasonably test the identification. State v. Smith, 430 So.2d 31, 43 (La.1983); State v. Guillot, 353 So.2d 1005, 1008 (La.1977). The question for a reviewing court is to determine whether the procedure is so conducive to irreparable misidentification that due process was denied. Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977); State v. Martin, 595 So.2d 592, 595 (La.1992); State v. Prudholm, 446 So.2d 729, 738 (La.1984). A defendant attempting to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure. State v. Prudholm, 446 So.2d at 738; State v. Chaney, 423 So.2d 1092, 1098 (La.1982).
We have reviewed the photographic array containing the picture of the defendant. In the array, all photographs depict African-American males with light moustaches. All share a similarity of skin complexion, have short hair, and none have beards. The defendant's photograph varies in overall tint from the rest of the array, attributable perhaps to a difference in processing, background color, or age of the original photograph, but a fair viewing does not support a conclusion that the array unduly focuses attention on the defendant.[5]Compare Robinson, supra, at 1377. Furthermore, there was sufficient physical similarity among the persons depicted to reasonably test Thomspon's identification. Finally, the defendant's claims that Thompson was pressed to select the defendant's photograph or that police were pressured to make an arrest are without support in this record.
As to the in-court identification of the defendant as the shooter, the totality of the circumstances does not present a substantial likelihood of irreparable misidentification under the factors set out in Manson v. Brathwaite, supra.[6] Thompson's three opportunities to view the defendant that night provided an independent basis for his in-court identification. The first opportunity came when he spotted two men and a woman conversing at the corner of Laussat and Montegut. The second occurred when the defendant and his accomplice slowly walked for a half-block down the middle of the street *1146 toward Thompson during which Thompson made eye contact with the defendant. The third occasion came when the assailants confronted the victim on the sidewalk, a few feet from the cab of the truck, where Thompson recognized the gunman as the same man with whom he had earlier made eye contact. Thus, Thompson had three opportunities to view the defendant at the time of the crime.
Although there was a dispute as to the amount of lighting at the scene of the crime, Thompson consistently testified that there was light enough for him to see the defendant. The defendant contends it was too dark outside the bar for the witness to have seen the perpetrators, because there were no lights on the building next to the truck, as evidenced by photographs of the scene, and there was cloud cover on account of the rain earlier that evening.[7] However, Thompson testified that it was not dark, that there was a streetlight on the corner of Laussat and Montegut, and that light from Creola's Bar carried across the street to where the truck was parked. Although Singleton agreed that it was "pretty dark," he had had only one occasion to see the perpetrators, when they appeared from the alley after he had entered the truck, and he did not testify that darkness prevented him from being able to identify them. Instead, Thompson had three opportunities to view the defendant with different lighting conditions each time: the first time was at the corner near the streetlight, the second was when the defendant walked past the truck in the middle of the street, where light from Creola's bar would have been unobstructed, and the third was when the defendant and his accomplice came out of the alley and up to the driver's side of the truck just a few feet from Thompson. No other evidence or testimony introduced at trial calls into doubt Thompson's claim that he could see the defendant adequately on each of the three occasions.
Additionally, Thompson's attention had been focused to a high degree on the man he later identified as the defendant. The defendant argues that Thompson was intoxicated, as evidenced by Thompson's admission that he had been drinking beer since before noon that day. Thompson, however, did not describe himself as drunk, nor did Singleton or anyone else testify at trial that Thompson was so inebriated that he could not have adequately seen what he says he saw. The evidence instead establishes that Thompson first observed the defendant and another man conversing with a woman at the end of the block. Then, the defendant's walk down the middle of Laussat Street with the other man brought the defendant close to the truck in which Thompson sat, at which point Thompson and the defendant made eye contact. Finally, Thompson was surely focused on the man who held the gun on his cousin, recognizing the man as the individual in the grey sweat suit he had seen minutes earlier.
The defendant next argues at length about the vagueness of the eyewitness's description of the gunman and the lack of similarity between that description and the defendant's actual appearance. Yet, the accuracy or inaccuracy of Thompson's limited initial description in this case does not establish a substantial likelihood that he has misidentified the defendant as the gunman, because whether the defendant is *1147 light- or medium-complected is a matter of perspective, and the difference between 5'7" and 5'9" is not significant when the one estimating is seated in a truck and the other is standing on the street or sidewalk. At any rate, the defendant's body weight matched Thompson's estimate of 140 pounds.
Furthermore, although it is true that Thompson did not describe the gunman as having a cast on his left hand, the testimony from the alibi witnesses, that the defendant was left-handed and that he had a cast on that hand the night of the crime, was inconclusive. Thompson testified that the gun was in the shooter's right hand, and no evidence indicated that the defendant's right hand was non-functional. Thus, the fact of the defendant's dominant, but wounded, left hand does not preclude a rational finding that he used his right hand to shoot the victim at a close range of several feet, as Thompson so testified. As for the matter of the eyeglasses the defendant alleges he has always worn, Thompson did not tell police that the gunman had been wearing glasses, nor did he recall at trial eyeglasses on the gunman. While Christmas testified that the defendant always wears glasses, Thomas stated only that the defendant "usually" wore glasses. Neither witness testified as to the defendant's ability or inability to see without his glasses.[8] Finally, though Thompson did not describe the gunman as sporting a moustache, the testimony of the defendant's own witnesses at trial was contradictory, with Thomas testifying that the defendant had not always worn a moustache and that he had "just recently" been doing so. In short, given the testimony of the defendant's own witnesses, we cannot conclude that the alleged discrepancies between the eyewitness's initial description of the gunman and the defendant's self-described appearance are such that misidentification was likely.
The remaining factors under Manson v. Brathwaite also do not support a finding that there is a substantial likelihood of irreparable misidentification. There is no indication that Thompson either hesitated or was uncertain in identifying the defendant. Further, though the photographic array was presented to Thompson some eighteen days after the incident, this delay was of no great significance, especially in light of the fact that there was no undue suggestiveness in the array itself. In sum, the district court properly denied the motion to suppress the in-court and out-of-court identifications.
In a similar vein, the defendant contends the evidence to prove identity was insufficient. He argues that the jury should not have believed Thompson's identification of him as the gunman, given the testimony of the defendant's alibi witnesses as well as the evidence that called into doubt Thompson's ability to make an identification.
When a key issue at trial is whether the defendant was the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof beyond a reasonable doubt. State v. Smith, 430 So.2d at 45; see also State v. Brady, 414 So.2d 364, 365 (La.1982); State v. Long, 408 So.2d 1221, 1227 (La.1982). The fact-finder weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983). However, we are mindful that the touchstone of Jackson v. Virginia is rationality and that "irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." State v. Mussall, 523 So.2d at 1310.
*1148 As noted previously, the defendant attacks Thompson's identification of him as the gunman an numerous fronts. He asserts, inter alia, that Thompson was drunk, as evidenced by his admission that he had been drinking beer "pretty steadily" since before noon that day and that it was too dark outside the bar for the witness to have seen the perpetrators. The defendant also argues that the testimony of the alibi witnesses correlates with the testimony of Thompson and Singleton, in that Christmas and Thomas both heard gunfire and then saw two men in hooded sweat suits rounding the corner from Laussat onto Montegut. The testimony of his witnesses also shows that the defendant, at the time of the crime, was wearing glasses, was left-hand dominant, had an ace bandage on his left hand, and was sporting a moustache. Thompson recalled none of these characteristics. Essentially, then, the defendant contends the jury could not have rationally accepted Thompson's identification testimony as credible in the face of these facts and the alibi testimony.
However, on the issue of identity, we do not find irrational the jury's credibility calls and evidence weighing in regard to Thompson's identification and the defendant's alibi evidence. "The trier of fact makes credibility determinations, and may, within the bounds of rationality, accept or reject the testimony of any witnesses." State v. Hampton, 98-0331, p. 13 (La.4/23/99), 750 So.2d 867, 880, 1999 La. LEXIS 1074, *25. Though the defendant makes much of the lighting and weather conditions, Thompson's testimony was not clearly unworthy of belief. He testified that he could see well that night and that he had seen the defendant on three occasions within a short period of time. As we discussed above, the alleged dissimilarities in Thompson's description of the gunman and the defendant's claimed appearance do not necessarily mandate a finding that Thompson's identification testimony was incredible. At any rate, as set forth above, the respective credibilities of the defendant's alibi witnesses were severely compromised on cross-examination. Furthermore, the defendant's claim to the contrary, we do not conclude that the witnesses were unfairly or improperly impeached. In short, the defendant has failed to show that the credibility choices the jury made in reaching the verdict of guilt were irrational. Accordingly, we find the evidence viewed in a light most favorable to the prosecution was sufficient under the standard articulated in Jackson v. Virginia.
The defendant also argues that the testimony of a single eyewitness, without other evidence to corroborate his identification of the defendant as the shooter, should be deemed legally insufficient in a capital case, especially where prosecutorial misconduct and other constitutional violations call into question the identification itself. Contending that a case resting on a single eye-witness identification is inherently unreliable, the defendant argues that the identification in this case "was extremely dubious, and was contradicted by the rest of the evidence."
We have held that independent evidence that a crime has been committed and testimony by a victim or eye-witness generally are sufficient to support a verdict of guilt. See State v. Mussall, 523 So.2d at 1311; State v. Rives, 407 So.2d 1195, 1197 (La. 1981). In this case, the defendant's arguments do not establish that Thompson's single eye-witness identification is unworthy of a finding of reliability or that a reasonable likelihood of misidentification exists. Furthermore, we have considered the various claims of error underlying the defendant's arguments and have found them to be either lacking a contemporaneous objection or without merit.

III.
The defendant's claim of "newly available" and newly discovered evidence was urged in his motion for new trial, which was denied by the district court.

*1149 Christina Davis

Prior to trial, the State's motion for a severance was granted by the district court. No reasons for the severance appear in the record; nor was there any objection to the ruling by defense counsel. At trial, the defendant attempted to call Christina Davis to testify in his behalf. The defendant apparently based his decision to call Davis on letters that she had written to him, the District Attorney's office, and another jail inmate. In these letters, which have neither been authenticated nor introduced in evidence in the district court, Davis allegedly states that she and the defendant are not guilty of the murder and that she was at the scene and can identify the real killer. The State, arguing that Davis would merely assert her Fifth Amendment privilege, objected on the ground that a witness who will invoke his rights under the Fifth Amendment cannot be called to the stand so that the invocation of that right is made before the jury. Outside of the presence of the jury, the court examined Christina Davis and her attorney, both of whom stated that she would invoke her Fifth Amendment privilege against self incrimination if called to the stand. The district court then ruled that Davis could not be called to the stand and questioned. An objection was noted for the defense, but no grounds for the objection were urged.
A defendant seeking a new trial based on newly-discovered evidence must show that the evidence was discovered since trial; that the failure to discover was not due to a lack of reasonable diligence; that the evidence is material; that the evidence is available; and, that the evidence is such that, had it been introduced at the trial, it would probably have changed the verdict or judgment of guilty. La.Code Crim. Proc. art. 851(3). When ruling on a new trial motion, a trial court's duty is the narrow one of ascertaining on an objective basis whether there is new material fit for a new jury's consideration. State v. Talbot, 408 So.2d 861, 885 (La. 1980).[9] The trial court has much discretion in ruling on a motion for new trial; however, if the court exercises this discretion arbitrarily, and the judgment is unjust, the reviewing court should set aside the judgment and order a new trial. State v. Hammons, 597 So.2d 990, 994 (La.1992); State v. Knapper, 555 So.2d 1335 (La. 1990).
In State v. Perique, 340 So.2d 1369, 1377 (La.1976), we stated the general rule that, after a joint trial, an allegation in a motion for a new trial by one co-defendant that the other co-defendant will now testify on his behalf is not a sufficient ground for the granting of a new trial. There, the defendants, Perique and Merritt, were jointly tried for possession with intent to distribute heroin. Perique was found guilty as charged and sentenced to life imprisonment; Merritt was found guilty of simple possession and sentenced to ten years. Merritt filed a motion for new trial on the basis of newly discovered evidence, claiming that Perique, having been convicted, was prepared to testify on her behalf. The district court denied the motion.
On appeal in Perique, we found no error in that ruling. We first reasoned that Merritt had failed to show the facts that would be established by Perique's testimony, as required by La.Code Crim. Proc. art. 854. Merritt had also failed to show that, had Perique's testimony been introduced at trial, it would probably have changed the verdict. La.Code Crim. Proc. art. 851(3). Finally, we concluded that, in any event, the allegation that a co-defendant in a joint trial would testify at a subsequent trial is an insufficient basis for granting a motion for new trial under Article 851.
*1150 In State v. Mince, 97-2947 (La.5/29/98), 714 So.2d 684 (per curiam), we acknowledged the rule we had stated earlier in Perique, and cited a number of federal cases with similar holdings.[10] However, we declined to decide whether the "skepticism" applied to the testimony of co-defendants tried together should also apply to the newly-available testimony of a witness who otherwise retains his Fifth Amendment privilege but volunteers to come forward and waive the privilege at a new trial to exculpate the defendant by taking responsibility for an offense the State has not charged against him. Id., p. 3, 714 So.2d at 686. Nonetheless, we held that, even assuming that testimony made newly available to the defendant because the witness has changed his mind with respect to the assertion of his Fifth Amendment privilege may, under certain circumstances, constitute newly-discovered evidence,[11] the defendant must still show pursuant to La. Code Crim. Proc. art. 854(1) "that he exercised reasonable diligence to present all of his evidence in a single trial." Id.
In Mince, the defendant and his brother were involved in an altercation with another man. The defendant was convicted of second degree battery. At trial, he claimed that, although he had initially grappled with the victim, his brother had struck the victim and knocked him down. An eyewitness conceded that the two men looked alike. The brother, who was not charged, did not testify. Following trial, however, the brother executed an affidavit alleging that, though he had previously wished to preserve his Fifth Amendment privilege, he now wanted to testify to correct a miscarriage of justice. The trial court granted the defendant's motion for new trial.
This court reversed, finding that the defendant had failed to show that he had exercised reasonable diligence to present the "newly available" evidence at trial. The defendant neither subpoenaed his brother nor made "any other significant effort" to procure his brother's testimony at trial. Mince, 97-2947, p. 3, 714 So.2d at 686. Thus, the defendant failed to show that his brother's testimony was "newly available" if not newly discovered. Further, the defendant had failed to show that his brother would be any more available to him at a new trial than he was at the first. La.Code Crim. Proc. art. 854(4). Finally, we reasoned that the brother's affidavit failed to provide any facts that he would establish at a new trial, as required by La.Code Civ. Proc. art. 854(3).
In the instant case, the "newly available" witness, Christina Davis, was a co-defendant indicted for the same offense as the defendant until the day of trial, when their cases were severed on motion by the State without objection. At trial, the defendant attempted to call Davis to testify in his behalf, but Davis, who remained under indictment for first degree murder at the time, stated she would invoke her Fifth Amendment privilege and refuse to testify. Now, after Davis has entered a plea of guilty to a reduced charge and has, presumably, served her sentence, the defendant argues that she is "newly available" to testify because she no longer has cause to invoke her Fifth Amendment privilege.
*1151 We note initially that the defendant, under La.Code Crim. Proc. art. 854(1) has failed to establish "that he exercised reasonable diligence to present all of his evidence in a single trial." Mince, p. 3, 714 So.2d at 686. As the defendant must concede, had he truly desired to secure the testimony of Christina Davis, and, more questionably, had Davis been willing to testify in his behalf if she were tried first, he did not move to sever the cases for trial and did not request that the court try Davis first. Instead, the defendant futilely attempted to call Davis to testify, knowing that she most likely would assert her privilege against self-incrimination. These efforts to secure Davis's testimony, and the lack thereof, cannot be deemed reasonable diligence.[12]
Nonetheless, even assuming that Davis's testimony could be considered "newly available" under these circumstances and thus newly discovered, we find the district court did not abuse its discretion in denying the motion for new trial. First, the defendant has failed to show that Davis would be willing to testify at a new trial. The defendant has produced no affidavit from Davis in which she states that she would testify at a new trial, nor did the defendant call her to so testify at the hearing on his motion for new trial.[13] Even assuming that Davis wrote the letters relied on by the defendant, none of which has been introduced in the district court, these letters contain numerous contradictory statements about her willingness to step forward. For example, though the writer at various points insists that she can identify the real killer and that "Poonie" and she are innocent, she also admits that, each time she has been given the opportunity to exonerate the defendant, she has chosen not to do so, instead, choosing to leave both hers and "Poonie's" fates to chanceeven though she was surely aware that she and "Poonie" faced a possible death sentence. She repeatedly states she is from "the old school" and cannot finger the real killer, who she insists must own up to his responsibilities. Nothing in the record suggests that the letter writer's intentions have changed, notwithstanding the defendant's allegation that Davis can now no longer invoke her Fifth Amendment privilege. Tellingly, despite the fact that the defendant was convicted and then sentenced to death, Davis has yet to appear in any court to give testimony on the defendant's behalf or to make a sworn affidavit in his favor. On this showing, the trial court could have little confidence that the witness, though presumably subject to process, would otherwise make herself available to the court and not continue to refuse to testify. See La.Code Crim. Proc. art. 854(4). Thus, it does not appear that the evidence is in fact available, as required by La.Code Crim. Proc. art. 851(3).
Furthermore, absent Davis's affidavit or testimony at the hearing on the motion for new trial, the defendant is hard-pressed to show the facts that the witness would establish at the new trial, as required by La.Code Crim. Proc. art. 854(3). Again, the defendant relies on the contents of the letters to make this showing, insisting that the letter writer has consistently stated the defendant's innocence. However, those letters contain many questionable statements and contradictions, particularly those explaining her involvement and presence at the scene, calling into doubt their veracity and reliability. Although the defendant selectively excerpted the letters at the hearing on the motion for new trial, he effectively invited the trial judge, as he does us on appeal, to conjecture as to what Davis's actual testimony might be were *1152 she to be called at a new trial. The trial judge faced with such questionable evidence could hardly conclude that the testimony of the letter writer would be "fit" for presentation to a new jury. Talbot, supra. Accordingly, the defendant has failed to demonstrate either that Davis will testify at a new trial or the facts Davis's testimony will establish at a new trial.[14]

Titania Richardson and Mary Nettles
The defendant also based his motion for new trial on the testimony of allegedly newly discovered witnesses, Titania Richardson and Mary Nettles.
Pursuant to a material witness warrant, Titania Richardson, who was serving time in Parish Prison at the time of the hearing, denied witnessing the murder, claiming instead to have been "just out there." Yet she was certain that the defendant was not one of the two men involved in the shooting. She was not interviewed by police that night or any other; she did not step forward before because she was frightened, as the men responsible live around her house. She knows them only as "Tracey" and "Mario." Richardson did not mention the murder until a month or so after the defendant's trial, when she bumped into the defendant's sister and later spoke on the telephone to her and the defendant's newly-enrolled counsel. She declined to get involved, and she denied telling the sister or the attorney that she had seen the victim's cousin remove something from the victim's pocket right after the shooting.
Mary Nettles, who owned a defunct bar directly across the street from Creola's, testified that she came to her darkened bar that night to pick up something. She came across a drunken man in a pick-up truck parked in front of her bar. When she asked him for a few dollars, he handed her two $10 dollar bills. Nettles testified that the man had been drinking all day and that this man, his cousin, and his friend would go into Creola's for a time, then come outside to drink. The defense made no attempt to establish how Nettles knew the actions of these people or, more importantly, whether she could identify the man in the truck as Freddie Thompson. While inside her bar, Nettles heard two or three shots. When she came outside, she saw two men with hoods running toward Montegut Street, where they turned right and kept going. Nettles says she did not recognize either man, but she ran after them, following them around the corner of Laussat and Montegut. According to Nettles, neither man wore a cast, one had a gun, and one was tall while the other was closer to her size. Nettles was able to discern these details even though she said it was dark and she could see only the backs of the men as they fled. Nettles knows the defendant, and has known his family for twenty or thirty years. She maintained that the defendant was not involved in the killing because, when she reached Laussat and Montegut in time to see the men turn on Law Street, she also saw defendant by a house belonging to "Yam," whose real name she believed to be William Thomas.
In support of the motion for a new trial, newly-enrolled defense counsel contended that Christina Davis's letters all but name the gunman as her cousin, Tracey Davis. On appeal, the defendant asserts that the letters have effectively identified Tracey Davis as the shooter and "Mario" as the other male accomplice. Det. Kaufman did testify at trial that Tracey Davis was a suspect; however, Thompson was unable to identify Tracey Davis as one of the perpetrators. According to the defense, the testimony of Richardson and Nettles clears the defendant and points to Tracey Davis as one of the assailants. Though Nettles did not identify the drunken man in the truck outside her bar, defense counsel, *1153 who assumed that Nettles had begged money from Thompson, argued that jurors did not learn that Thompson was so intoxicated he was unable to distinguish between one and ten dollar bills. This new evidence, counsel maintained, undermined the already weak single-eyewitness identification case. If nothing else, counsel urged, the ends of justice demanded a new trial.
The State responded that no one could identify Tracey Davis and that nothing connected him to the crime. As for Richardson, the State argued, she denied being a witness and, in any event, waited over a year before coming forward, however reluctantly. Nettles, a long-time friend of the defendant's family, also waited for almost two years before giving her testimony. Finally, the State argued, the defense did not call the defendant's first two attorneys to determine whether Richardson and Nettles were known to the defense, but not called at trial for strategic reasons.
We do not find that the district court abused its discretion in denying the motion for new trial. Titania Richardson denied witnessing the shooting, admitting only to having been "out there" without explaining her location in relation to the assault on the victim or the direction the assailants took when they fled the scene. The basis of her information is thus suspect. Additionally, her criminal record and details of her current incarceration are unknown. As for Mary Nettles, her name appears on the co-defendant's witness list of May 24, 1996. Counsel for the defendant, who had adopted all pleadings and motions of counsel for co-defendant Christina Davis, surely had presumptive knowledge of the witness list he had jointly submitted and of Nettles's testimony. Consequently, it is implausible that, given Nettles's appearance on the defense witness list and her longstanding relationship with the defendant's family, trial counsel was unaware of, or that reasonable diligence would not have uncovered, Nettles's exculpatory account of the incident until twenty-two months after the murder and four months after the defendant's trial. Therefore, the defendant's claims of newly-discovered evidence were reasonably rejected by the district court.
In summary, the defendant does not demonstrate that the proffered evidence was not known before trial or that reasonable diligence would not have uncovered these witnesses. The defense showing does not undermine confidence in the outcome, hint at a fundamentally unfair trial, or support a view that in combination any perceived errors mandate a new trial. Defendant offers only innuendo and conclusory allegations in support of the consolidated claims; hence, he fails to show that a new trial under Article 851(3) is justified. We find no abuse of the district court's discretion in ruling on the motion for new trial.

IV.
On appeal, the defendant alleges the state improperly manipulated the order of trial so as to preclude Christina Davis from testifying at his trial, thereby denying him his Fifth and Sixth Amendment rights to mount a defense and to present a material witness. The defendant essentially relies on State v. Walland, 555 So.2d 478 (La.App. 4th Cir.1989), and Taylor v. Singletary, 122 F.3d 1390 (11th Cir.1997), which are discussed below.
Article V, § 26(B) of the Louisiana Constitution provides that the district attorney controls the administration of criminal prosecutions. Further, La.Code Crim. Proc. art. 61 states that "subject to the supervision of the attorney general, as provided in Article 62, the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute." Additionally, La.Code Crim. Proc. art. 704(A) provides: "Jointly indicted defendants shall be tried jointly unless: (1) The state elects to try them separately; or (2) The court, on motion of the defendant, and after contradictory hearing with the district *1154 attorney, is satisfied that justice requires a severance."
In State v. Walland, supra, the court of appeal reversed a trial court ruling denying the defendant's request that his co-defendant be tried first so that the co-defendant could testify on his behalf. The defendant and a co-defendant were jointly charged with possession of a stolen vehicle. The defendant filed a motion for severance, arguing that the co-defendant wished to testify on his behalf, but that self-in-crimination concerns would prevent it if the two were tried together. The motion was supported by an affidavit from the co-defendant stating that he would testify on behalf of the defendant at a separate trial, but that he would not testify at a joint trial due to concern for his own Fifth Amendment rights. The trial court granted the severance based on the affidavit; however, the State proceeded to trial against the defendant first. The defendant objected to the order of trial, arguing that the co-defendant would not testify unless he was tried first. When the trial court denied his objection, the defendant applied for supervisory writs to the court of appeal.
Relying primarily on United States v. DiBernardo, 880 F.2d 1216 (11th Cir. 1989),[15] the Walland court held that the defendant's constitutional right to present a defense entitled him to a trial following that of his co-defendant. Walland, 555 So.2d at 482. The court reasoned that, once the trial court granted a severance, only one order of trials was "equitably possible" and that the District Attorney's statutory authority to control the prosecution could not supersede the defendant's constitutional right to a fair trial, to present a defense, and to call his witness. Id. The court ordered that the co-defendant's trial be scheduled prior to the defendant's trial.
In Taylor v. Singletary, 122 F.3d 1390 (11th Cir.1997), the Eleventh Circuit Court of Appeals held that the state trial judge, who has discretion to set the order in which co-defendants will be tried, violated the defendant's Fifth and Sixth Amendment rights in denying his pre-trial request that his co-defendant be tried first. The defendant and the co-defendant were charged with first degree murder. After the co-defendant's motion for severance was granted, the defendant moved to be tried after the co-defendant, so that the co-defendant could provide exculpatory testimony on his behalf. The defendant supported his motion with an affidavit from the co-defendant, in which the co-defendant stated that he would assert his Fifth Amendment privilege until his trial was completed and that, whether convicted or acquitted, he would testify at the defendant's trial. The affidavit authorized the co-defendant's attorney to make an in camera proffer as to the details of the co-defendant's proposed testimony. The trial court denied the motion. At trial, the defendant called the co-defendant to the *1155 stand, but the latter invoked his Fifth Amendment privilege. The defendant was convicted as charged, while the co-defendant was later acquitted at his trial, at which he had testified on his own behalf. On appeal in the state courts, the defendant unsuccessfully argued that the trial court had abused its discretion in denying his motion to be tried after his co-defendant and that his right to present material, exculpatory testimony was denied.
The Eleventh Circuit affirmed the federal district court's finding that the defendant's constitutional right to present a material witness had been violated, but the appellate court, noting that the district court had applied an incorrect standard, concluded that the error was not harmless. Citing DiBernardo, supra, and Byrd v. Wainwright, 428 F.2d 1017 (5th Cir. 1970), the Taylor court held that judicial economy in determining the order of trial must yield to the defendant's right to a fair trial. Equating the potential constitutional harm of a particular sequence of trial with the denial of a severance, the court reasoned that the same factors the trial court considers before ruling on a motion for severance are relevant when the defendant seeks a certain order of trial. Specifically, the defendant must show: (1) his bona fide need for the co-defendant's testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony, and (4) the likelihood that the co-defendant will testify on his behalf. Taylor, 122 F.3d at 1393. By the same token, to show an abuse of the trial court's discretion in scheduling the order of trials, the defendant on appeal must prove that he suffered compelling prejudice. Id. The court found that the defendant had had a bona fide need for the co-defendant's testimony, that the substance, nature, and effect of the testimony favored granting the motion, and that it was very likely the co-defendant would have testified on the defendant's behalf. The court concluded that the trial court had abused its discretion in denying the defendant's motion, because the exclusion of the co-defendant's testimony had caused the defendant prejudice. The Taylor court, after reviewing the trial testimony in light of the co-defendant's testimony at his trial, went on to conclude that the trial court's error was not harmless, because the defendant had established that the unavailable evidence "`could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Taylor, 122 F.3d at 1395 (quoting Kyles v. Whitley, 514 U.S. 419, 434-35, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995)).
The procedural facts in the instant case are distinguishable from Walland, Taylor, and DiBernardo. In Walland and DiBernardo, the defendants prior to trial moved for severance requesting that a co-defendant, who was willing to provide material, exculpatory evidence, be tried first. Furthermore, the defendants in those cases, as did the defendant in Taylor, objected to the order of trial when the trial courts did not agree to try first the co-defendants who were willing to provide exculpatory evidence.
Here, the defendant did not move for a severance prior to trial, nor did he object to the State's motion to sever trial and to proceed with trial against the defendant. Instead, the defendant vainly attempted to call Davis to the stand during trial, presumably knowing that she was facing the same first degree murder charge and that she would most likely invoke her Fifth Amendment privilege. Furthermore, the record does not permit us to conclude that the State engaged in misconduct by electing to try the defendant first. The defendant's allegation that the State knew prior to the date of trial that he would attempt to call Davis to testify on his behalf is simply without support in the record.[16] At *1156 any rate, absent a written motion to set the order of trial or an objection to the State's decision to proceed against the defendant first, there is nothing for this court to review. La.Code Crim. Proc. art. 841; State v. Taylor, 93-2201, p. 7 (La.2/28/96), 669 So.2d 364, 369.
The defendant also claims the district court erred in granting Christina Davis a blanket privilege against self-in-crimination. He argues that he was precluded from asking her questions the answers to which would not have inculpated her but would have exonerated him.
We find the district court did not err in ruling that Davis was unavailable as a witness once she and her attorney indicated that, if called, she would invoke her Fifth Amendment privilege and refuse to testify. The "availability" of a witness under La.Code Evid. art. 804(A)(1) is a matter for the court, and proceedings to assert a privilege should be held outside a jury's hearing. It is improper for either side to call a witness, knowing that the witness will assert a privilege, solely to impress upon jurors the fact that the privilege is being claimed. State v. Berry, 324 So.2d 822, 830 (La.1976); see also State v. Haddad, 99-1272, p. 6 (La.2/29/2000), 767 So.2d 682, 684, 2000 La. LEXIS 507, *11.[17] When the purpose is other than to draw negative evidentiary inferences from a claim of privilege, courts have allowed jurors to observe the process. See State v. Wille, 559 So.2d 1321, 1336-38 (La.1990) (state allowed to call accomplice so that jury could observe claim of Fifth Amendment privilege after the defense made repeated references to accomplice's absence).
In general, a blanket Fifth Amendment privilege is permissible when the witness is charged with participating in the same crime for which the defendant is being tried, and when it is apparent that the inquiry will be devoted to subject matter that would raise in the witness reasonable cause to apprehend danger from a direct answer or an explanation as to why one cannot be given. State v. Brown, 514 So.2d 99, 109-11 (La.1987) (citing State v. Darby, 403 So.2d 44, 48-49 (La.1981)); State v. Edwards, 419 So.2d 881, 892 (La. 1982); State v. Coleman, 406 So.2d 563, 566 (La.1981); but see State v. Wilson, 394 So.2d 254, 257-59 (La.1981)(a privilege may be asserted only as to particular questions). The United States Supreme Court has observed that, "[t]o sustain the privilege [against self-incrimination,] it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer ... or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." Hoffman v. United States, 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951).
Here, trial counsel did not seek to ask Davis particular questions. Nor did he offer reasons in support of the district court's sua sponte and pro forma action in "not[ing] an objection ... on behalf of [the defense]" when it ruled that Davis was unavailable as a witness. Appellate counsel's suggested questions, which he views *1157 as non-privileged and reasonable, include queries on whether Davis knew the defendant, whether she saw him the night of the crime, and whether he spoke to her the day or night of the murder. Given Davis's deep involvement in the circumstances surrounding Barnes's death, as evidenced by her statements and letters, we find that requiring Davis to answer these proposed questions directly, or to explain why she could not answer them, would have risked injurious disclosure that could very likely have incriminated her, vitiating the very privilege she sought to exercise. See State v. Brown, 514 So.2d at 109 (rejecting inquiries along similar lines); Hoffman v. United States, supra. The trial court's ruling was proper.

V.
The defendant also alleges that his trial counsel's performance was so defective as to render him without the effective assistance of counsel.
A criminal defendant is guaranteed the effective assistance of counsel. United States Sixth Amendment; La. Const. art. I, § 13; Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Washington, 491 So.2d 1337 (La.1986). To establish a claim of ineffective assistance, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and, that counsel's professional errors resulted in prejudice to the extent that it undermined the functioning of the adversarial process and rendered the verdict suspect. Strickland v. Washington, supra; Lockhart v. Fretwell, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). This does not mean "errorless counsel [or] counsel judged ineffective by hindsight, but counsel reasonably likely to render effective assistance." State v. Ratcliff, 416 So.2d 528, 531 (La.1982).
A claim of ineffectiveness is generally relegated to post-conviction, unless the record permits definitive resolution on appeal. E.g., State v. Prudholm, 446 So.2d 729 (La.1984). However, when the record is sufficient for review, this Court will reach the merits of complaints about counsel's performance and grant relief when appropriate. E.g., State v. Hamilton, 92-2639 (La.7/1/97), 699 So.2d 29, 32-35.
The defendant makes a serious allegation that his counsel's performance was deficient. He asserts that trial counsel, who is now deceased, failed to prepare adequately for trial: counsel visited his client on only one occasion in the six months before trial, and then for only ten minutes; counsel filed only one motion on his owna motion to withdraw following trial; counsel had no discernible trial strategy tailored to the defendant, as counsel relied solely on Christina Davis's counsel to file any and all pre-trial motions; counsel was unaware that his client had never been arraigned; and counsel failed to secure the presence at trial of witnesses apparently known to the defense. He also asserts that his counsel's performance during trial was derelict: counsel failed to object to hearsay evidence; counsel failed to object to prosecutorial misconduct; and counsel failed to rehabilitate the defendant's alibi witnesses.
Although the defendant argues otherwise, the record before us is insufficient for us to make definitive findings as to the claim of ineffective assistance of counsel. Accordingly, that claim is relegated to post-conviction relief, where an evidentiary hearing may be conducted to develop a sufficient record on the issues raised.

DECREE
For the reasons assigned, we set aside the defendant's first degree murder conviction and death sentence. We hereby modify the jury's verdict of guilty of first degree murder and render a judgment of guilty of second degree murder. La.Code Crim. Proc. art. 821(E). We remand the case to the district court for sentencing of the defendant on the modified judgment to *1158 serve life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence as provided for in La.Rev. Stat. 14:30.1(B).
CONVICTION OF FIRST DEGREE MURDER AND DEATH SENTENCE SET ASIDE; JUDGMENT OF GUILTY OF SECOND DEGREE MURDER RENDERED; REMANDED TO THE DISTRICT COURT FOR SENTENCING OF DEFENDANT TO LIFE IMPRISONMENT AT HARD LABOR WITHOUT BENEFIT OF PAROLE, PROBATION, OR SUSPENSION OF SENTENCE.
NOTES
[*] Lemmon, J., not on panel. See Rule IV, Part 2, § 3.
[1] Co-defendant Christina Davis pleaded guilty in September of 1996 to an amended charge of being an accessory after the fact of the commission of first degree murder, in violation of La.Rev.Stat. 14:25. Pursuant to a plea agreement, the district court sentenced her to serve eighteen months at hard labor with credit for time served.
[2] The two bullets striking the victim's back were recovered intact; the third fragmented upon impact. Analysis of microscopic striations on the intact bullets established that they were fired from the same weapon, a .32 caliber revolver. The fragmented bullet could not be analyzed.
[3] Compare State v. Davis, 93-0663 (La.App. 4 Cir. 2/25/94), 633 So.2d 822, writ denied, 94-2077 (La.9/20/96), 679 So.2d 422. There, two of the victims were walking away from Brigtsen's restaurant; the third victim followed a short distance behind. After a car passed by the first two and stopped, the defendant exited the car, walked up behind one of the victims, and, unbeknownst to her, pointed a gun toward her head. Upon seeing the defendant do this, the third victim shouted and grabbed the defendant; a struggle for the weapon ensued. Ultimately, the victim who grabbed the defendant was shot once by him and once by a co-defendant; the defendant also fired his gun at one of the other victims. No evidence indicated that the victims knew either of the assailants. Finding the evidence sufficient to support the conviction on the attempted armed robbery count, the court of appeal concluded the jury could have reasonably inferred from these circumstances that the defendant had intended to commit an armed robbery.
[4] This misconduct allegedly includes false suggestions that other witnesses were too afraid to come forward, the introduction of hearsay evidence in violation of the confrontation clause of the constitution, and improper references to a television show about persons sought by law enforcement agencies. The defendant also asserts that the prosecutor erroneously equated the reasonable doubt standard to a preponderance of the evidence. We have considered the defendant's contentions and have found them to be without merit.
[5] All of the images appear to have been stored in a computer, as Detective Kaufman's testimony indicated, and then printed on the same type and brand of photographic print paper.
[6] If a suggestive identification procedure has been proved, the reviewing court must look to several factors to determine, from the totality of the circumstances, whether the suggestive identification presents a substantial likelihood of misidentification at trial. State v. Martin, 595 So.2d at 595. These factors, set out in Neil v. Biggers, 409 U.S. 188, 199-200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), and approved in Manson v. Brathwaite, supra, include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the time of the identification; and (5) the time between the crime and the confrontation. Martin, 595 So.2d at 595. The corrupting effect of the suggestive identification itself must be weighed against these factors. Id.
[7] The defendant now suggests that it was raining at the time of the offense. Thompson testified that it had been "sprinkling rain" when the three men earlier visited a washateria where Barnes had entered a football pool. Thompson explained that the men then went to Barnes's home to replace the battery in the truck so that the windshield wipers would work. This detour to Barnes's home occurred before the men arrived at Creola's. Though defense counsel did establish from Thompson that it had been raining at 10:00 p.m. that evening, there is no testimony that it was actually raining at the time of the offense shortly after midnight. Furthermore, the photographs of the scene taken by the police depict the ground as relatively dry, suggesting that any rain that fell either was light or had ended some time earlier.
[8] Whether the defendant was wearing glasses at trial is unknown; the photograph of the defendant does not depict him with eyeglasses.
[9] In Talbot, we emphasized that the trial judge's duty in deciding a motion for new trial based on newly discovered evidence is not to determine the innocence of the accused or to weigh the new evidence as though the judge were a juror determining what is true and what is false.
[10] United States v. Freeman, 77 F.3d 812, 817 (5th Cir.1996) ("When a defendant is aware of a co-defendant's proposed testimony prior to trial, it cannot be deemed newly discovered under F.R.Crim.P. 33 even if the co-defendant was unavailable because he invoked the Fifth Amendment."); United States v. Reyes-Alvarado, 963 F.2d 1184, 1188 (9th Cir.1992) ("It would encourage perjury to allow a new trial once co-defendants have determined that testifying is no longer harmful to themselves."); United States v. Jacobs, 475 F.2d 270, 286, n. 33 (2nd Cir.1973) ("[A] court must exercise great caution in considering evidence to be `newly discovered' when it existed all along and was unavailable only because a co-defendant, since convicted, had availed himself of his privilege not to testify.").
[11] United States v. Montilla-Rivera, 115 F.3d 1060 (1st Cir.1997); United States v. Ouimette, 798 F.2d 47 (2nd Cir.1986).
[12] The record does not support a finding that Christina Davis's purported testimony was not known to or discoverable by the defense prior to trial.
[13] In his reply brief, the defendant claims the State prevented him from calling Davis to the stand at the hearing on the motion for new trial. The defendant, however, made no attempt to call Davis at the hearing.
[14] Although the defendant argues that Davis names her cousin Tracey Davis as the killer, none of the five letters submitted to this court contains language stating that Tracey Davis is the killer.
[15] In United States v. DiBernardo, supra, three co-defendants were to be jointly tried. Two filed motions to sever based on the affidavit of the third co-defendant that he would provide exculpatory testimony on their behalf at a separate trial, otherwise, he would invoke his Fifth Amendment privilege. The trial court granted the motion to sever, but it decided the defendants had no right to determine the order of trial. At the trial of the two defendants, the co-defendant was called as a witness but invoked his Fifth Amendment privilege despite being placed in contempt. The defendants were convicted and moved for a new trial. They subsequently appealed, although the trial court never ruled on the motion for new trial.

After the co-defendant pleaded guilty and was sentenced, one defendant successfully reurged the motion for new trial. The district court recognized that it had erred in granting the motion to sever while compelling the defendants to be tried first. The court granted the motion for new trial after finding that the co-defendant's testimony was material and could have resulted in a different verdict. The Eleventh Circuit affirmed, holding that the trial court's scheduling of trials had resulted in a de facto denial of the motion for severance and that the defendant had been denied his right to a fair trial.
[16] Given Davis's criminal history and the statement she gave to police, not to mention the letters attributed to her, there is no credible suggestion that, had the State proceeded to try the defendant and Davis jointly, Davis would have testified at trial, either on her own behalf or the defendant's.
[17] In State v. Berry, this court held that it is improper for either the prosecution or the defense knowingly to call a witness who will claim a privilege, for the purpose of impressing upon the jury the fact of the claim of privilege. The court noted that claims of privilege are preferably determined outside the presence of the jury, because undue weight may be given to the claim of privilege. 324 So.2d at 830. The holding in Berry was recently upheld in State v. Haddad, supra, which further held that a special "neutralizing" instruction to the jury may be given upon demand when the defendant is denied his request that a witness take the stand to assert her claim of privilege. 99-1272, p. 9, 767 So.2d at 685. In Haddad, we concluded the district court's failure to give a requested "neutralizing" instruction was prejudicial error and remanded the case for a new trial. Id.