875 So.2d 934 (2004)
STATE of Louisiana
v.
Derrick PEDEN.
No. 04-KA-71.
Court of Appeal of Louisiana, Fifth Circuit.
May 26, 2004.
*937 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Andrea F. Long, Walter G. Amstutz, Paige Cline, Assistant District Attorneys, Gretna, LA, for Plaintiff/Appellee.
Margaret S. Sollars, Louisiana Appellate Project, Thibodaux, LA, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY, and WALTER J. ROTHSCHILD.
THOMAS F. DALEY, Judge.
Defendant, Derrick Peden, appeals his convictions for armed robbery and possession of stolen things. On appeal, he assigns four errors of the trial court:
1. The Trial Court erred by failing to suppress the identifications obtained in violation of the defendant's constitutional rights.
2. The Trial Court erred by failing to grant the defendant's Motion for a Mistrial when the defendant's physical and mental condition was impaired.
3. The evidence at trial was insufficient to prove that Mr. Peden committed these crimes.
4. The Trial Court erred by not putting in the record reasons for its excessive sentence.
After thorough review, we find no merit to Peden's Assignments of Error. However, our review of errors patent disclosed a double jeopardy violation. Accordingly, we vacate Peden's conviction and sentence for possession of stolen things, but in all other aspects, affirm.

PROCEDURAL HISTORY
On July 2, 2002, the Jefferson Parish District Attorney filed a Bill of Information charging Peden with three criminal offenses. In count one, Peden was charged with armed robbery. LSA-R.S. 14:64. In count two, he was charged with possession of a firearm by a convicted felon. LSA-R.S. 14:95.1. In count three, the State charged Peden with illegal possession of stolen things valued at over $500.00. LSA-R.S. 14:69. Peden was arraigned on July 3, 2002, and pled not guilty to all three charges.
*938 On July 17, 2002, Peden filed a Motion to Suppress the Evidence, Confession, and/or Identification. On August 14, 2002, the trial court heard and denied the Motion to Suppress the Identification. On October 9, 2002, Peden filed a Motion to Appoint Sanity Commission to Determine Competency to Stand Trial. The court conducted a sanity hearing on November 20, 2002, and found defendant competent to stand trial.
On July 16, 2003, the State amended the Bill of Information to change the name of the alleged victim in count three. On July 16 and 17, 2003, Peden was tried by a twelve-person jury as to counts one and three only.[1] The jury returned a verdict of guilty as charged as to both offenses.[2]
On August 6, 2003, the trial court sentenced Peden to fifty years at hard labor on count one, without benefit of parole, probation, or suspension of sentence. On count three, the court sentenced Peden to ten years. The court further ordered that the two sentences run concurrently. Peden made an oral Motion for Appeal, and filed a written appeal motion that day. The trial court granted an appeal on October 3, 2003.
The State filed a habitual offender Bill of Information, alleging Peden to be a second felony offender. On August 6, 2003, he was apprised of the State's allegations, and entered a denial. The trial court held a habitual offender hearing on August 20, 2003, and found Peden to be a second felony offender.
On August 25, 2003, the trial court vacated Peden's original sentence as to count one, and imposed an enhanced sentence of fifty years at hard labor without benefit of probation or suspension of sentence. Peden made an oral Motion for Appeal.

FACTS
Michael Cooks testified that on May 18, 2002, he was employed selling used cars at Gene Ducote Chrysler Jeep in Harvey. Defendant, Derrick Peden, approached Mr. Cooks and asked what he would be required to provide if he were to purchase a vehicle there. Mr. Cooks told Peden he would need between $1,000.00 and $1,500.00 for a down payment, and would have to show proof of employment. Peden left the lot, and returned thirty to forty minutes later, riding a red bicycle.
Peden told Mr. Cooks he wanted to test drive a 1996 Chrysler with an asking price of $7,995.00. Mr. Cooks testified that company policy required the sales staff to photocopy a customer's driver's license before allowing a test drive. Mr. Cooks, however, decided against walking across the car lot to the office to copy Peden's license. Instead, he accompanied Peden on a test drive of the Chrysler.
Peden asked Mr. Cooks whether he could stop at his girlfriend's house to show her the car. Mr. Cooks gave his consent, and Peden stopped the car in front of a house in Gretna. Peden exited the car, taking the keys with him. He asked Mr. Cooks to go inside with him. Mr. Cooks followed Peden to the side of the house. Peden drew a chrome-plated handgun and told Mr. Cooks he just wanted the car. He ordered Mr. Cooks to kneel behind a shed, and Mr. Cooks complied. Peden got into the car and left the area.
Mr. Cooks called police from a pay telephone on the Westbank Expressway. He *939 then called Clifford Smith, his supervisor at the car lot, to report the robbery. Officers from the Gretna Police Department responded. Mr. Smith picked up Mr. Cooks and drove him back to the dealership.
Mr. Smith testified that Peden first approached him when he arrived at the dealership, and that he instructed Peden to speak to Mr. Cooks about a test drive. Mr. Smith stated that he spoke to police when he picked up Mr. Cooks following the robbery. Mr. Smith informed officers that the perpetrator had left a bicycle at the car dealership. The officers retrieved the bike.
At 6:30 a.m. on May 27, 2002, Deputy David Jackson of the Jefferson Parish Sheriff's Office saw Peden driving the Chrysler. He recalled that the Gretna Police Department had issued an all points bulletin for a car meeting the Chrysler's description. Deputy Jackson observed that the car had a taxi cab license plate, but it was not otherwise designated as a taxi. Peden made an illegal turn, and Deputy Jackson performed a traffic stop.
Peden stopped the car, exited, and walked to the passenger side. Deputy Jackson asked Peden for his driver's license, car registration, and proof of insurance. Peden told the officer that he did not have a driver's license or other documentation, and that the car belonged to his brother. Deputy Jackson looked inside the car to determine whether the steering column had been defeated, and observed that it was intact. Deputy Jackson also saw a .9 mm handgun in plain view on the driver's side floorboard.
Deputy Jackson attempted to handcuff Peden to facilitate further investigation. Peden resisted, punching the officer in the chest. Deputy Jackson managed to subdue Peden and place him in handcuffs. Deputy Jackson ran the Chrysler's license plate on the police computer, and found that it did not match the car. Deputy Jackson placed Peden under arrest, and notified the management at Gene Ducote Chrysler Jeep that the car had been recovered.
Following Peden's arrest, Detective Russell Lloyd of the Gretna Police Department compiled a photographic lineup, in which he included a picture of Peden. He met with Clifford Smith and Michael Cooks individually, and showed them each the lineup. Mr. Smith identified Peden as the man who took the Chrysler on a test drive on the night of May 18, 2002. Mr. Cooks identified Peden as the person who robbed him of the car at gunpoint.
Peden's mother, Ima Jean Nabe, testified on his behalf at trial. She stated that she had seen a family friend, "Robert," driving the Chrysler around the time that Peden was arrested. Robert told her the car was a rental. Ms. Nabe testified that she did not see Peden in possession of the car.
Ms. Nabe stated that she had at one time made a sworn statement to the effect that Peden was with her on May 18, 2002. However, she had been mistaken as to the date. She now remembered that Peden was in Philadelphia on May 18, the date of the robbery.
Peden testified that he was in Philadelphia visiting his aunt on May 18, 2002. He admitted to having driven the Chrysler on May 27, 2002. He said that he believed the car was his brother's. He located the keys on a table, and used the car to go to a store. Peden denied that he was in possession of a gun, or that he robbed anyone.

ASSIGNMENT OF ERROR NUMBER THREE
Peden argues that the evidence at trial was insufficient to support his convictions, as the State failed to prove identity. *940 When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine sufficiency of the evidence. When the entirety of the evidence, including inadmissible evidence, which was erroneously admitted, is insufficient to support the conviction, the accused must be discharged as to that crime, and any issue regarding trial errors becomes moot.[3] For the foregoing reasons, defendant's third Assignment of Error will be addressed first.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia,[4] requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.[5]
Armed robbery is defined by LSA-R.S. 14:64 as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." In order to convict an accused of the possession of stolen things valued at more than five hundred dollars, the State must prove that he (1) intentionally possessed, procured, received, or concealed, (2) anything of value, (3) which has been the subject of any robbery or theft, (4) where the circumstances indicate that the offender knew or had good reason to believe that the thing was the subject of one of these offenses, and (5) where the value of the items stolen exceeds $500.00.[6]
Encompassed in proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator. When the key issue in the case is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof.[7]
As to the element of identity, the State produced the testimony of Michael Cooks, the robbery victim; and Clifford Smith, Mr. Cooks' supervisor at the car dealership. Mr. Cooks testified that he called police immediately after the robbery, and that he spoke to officers shortly thereafter. He described the perpetrator to the investigating officer as being five feet, eight inches to five feet, ten inches tall. He had a short, afro style haircut, dark brown eyes, and a light brown complexion. He told the officer he would recognize the perpetrator if he were to see him again.
Mr. Smith testified that he spoke to the perpetrator at the car lot before Mr. Cooks took the man for a test drive. Mr. Smith testified that he conversed with the responding officers when he picked up Mr. Cooks following the robbery. He gave the officers the stolen car's vehicle identification number and told them he had spoken to the perpetrator at the car lot. He did *941 not, however, give a physical description of the perpetrator at that time.
Detective Russell Lloyd testified that the original police report was completed by Officer Jason Fay. Officer Fay left the Gretna Police Department prior to Peden's trial, and he did not testify. Detective Lloyd further stated that he put together a photographic lineup following Peden's arrest. He showed the lineup to Mr. Cooks and Mr. Smith separately. Mr. Smith identified Peden as the man he saw at the car dealership on the night of May 18, 2002. Mr. Cooks identified Peden as the man who robbed him of the Chrysler. Both Mr. Cooks and Mr. Smith identified Peden in court. Mr. Cooks identified the gun recovered from the stolen Chrysler at the time of Peden's arrest as the gun Peden used to rob him.
Peden contends that the identifications made by the State's witnesses were unreliable, as it conflicted with the description included in Officer Fay's report.[8] Peden argues that the report shows the witnesses described the perpetrator as bald, when he is clearly not bald. However, Mr. Cooks testified at trial that he never described the perpetrator as "bald." Mr. Cooks further testified that he distinctly recalled the perpetrator wore his hair in a short afro hairstyle. Mr. Smith testified that on the night of the robbery he gave some general information to the responding officers. The officers did not, however, interview him that night. Officer Fay did not list Mr. Smith as a witness in the initial police report. Mr. Smith further testified that, if Officer Fay described the perpetrator as bald in his report, he was incorrect.
Detective Lloyd testified that in the space provided on the police report form for the perpetrator's hair color, Officer Fay responded "bald/none." Detective Lloyd explained that the officers in his department complete their reports on laptop computers. They use prefabricated forms on which they provide the pertinent responses in each of the labeled sections. When an officer wishes to list a suspect's hair color, he accesses a drop-down menu with several choices. One of those choices is "bald/none." If the officer does not know the hair color, or none is given, the applicable choice is "bald/none." Detective Lloyd testified that it is possible Officer Fay selected that description on the form because he did not ask the witness for the perpetrator's hair color. Based on the officer's explanation, the description in the police report does not present a discrepancy.
Peden argues that the prosecution's failure to produce fingerprint evidence linking him to the robbery was a weakness in the State's case. Gordon McGraw was the crime scene technician assigned to the investigation. He testified that he attempted to lift fingerprints from the bicycle Peden was alleged to have left at the car dealership. McGraw testified that he was unable to lift any usable prints from the bike. He was not asked to process any other evidence for fingerprints.
Fingerprint evidence was not vital to the State's case. Eyewitness testimony connected Peden to the robbery, and Peden's presence in the car went toward proving the possession of stolen things charge.
Peden contends that the State's evidence was refuted by his and his mother's alibi testimony. Both Peden and Ima Jean Nabe testified that he was in Philadelphia at the time of the robbery. Ms. Nabe *942 stated that she saw someone named Robert in possession of the car. Although Ms. Nabe characterized Robert as a family friend, she did not know his last name, or anything else about him.
Peden testified that he drove the Chrysler on May 28, 2002, because it was parked in his driveway and he believed it belonged to his brother. He did not know it had been stolen. The jury apparently chose not to believe Peden's testimony. Peden was identified by credible prosecution witnesses as the man who appeared at the car dealership on the night of May 18, 2002. Peden's credibility was called into question by Deputy Jackson's testimony regarding defendant's evasive and combative behavior at the time of the traffic stop. Moreover, Peden testified that he had a prior armed robbery conviction. Credibility determinations rest with the trier-of-fact, and will not be re-weighed on appeal.[9]
Based on the foregoing, it appears that the State met its burden negating any reasonable probability of misidentification. This Assignment of Error merits little consideration.

ASSIGNMENT OF ERROR NUMBER ONE
Peden argues that the trial court erred in denying his Motion to Suppress the Identifications, as the photographic lineup were suggestive, and the record shows there was a substantial likelihood of misidentification. Fairness is the standard of review for identification procedures, and reliability is the linchpin in determining the admissibility of identification testimony.[10] In Manson v. Brathwaite, the United States Supreme Court listed five factors to be considered in determining whether an identification is reliable: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and, (5) the time between the crime and the confrontation. A trial court's determination of the admissibility of an identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion.[11]
An identification procedure is suggestive if it unduly focuses a witness's attention on the suspect.[12] A defendant attempting to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure.[13] In determining whether the ruling on a defendant's Motion to Suppress is correct, an appellate court is not limited to the evidence adduced at the suppression hearing, but may also consider evidence adduced at trial.[14]
The trial court heard Peden's Motion to Suppress the Identification on August 14, 2002, and denied it without reasons. Detective Lloyd of the Gretna Police Department testified that on May 27, 2002, he received word that the car taken in the instant robbery had been located, *943 and a suspect arrested. Based on the information he received, he compiled a photographic lineup, and included a picture of Peden. Detective Lloyd testified that he found a photograph of Peden by using the police computer, and he filled out the lineup with pictures of men whose physical characteristics were similar to those of defendant.
Detective Lloyd contacted Clifford Smith and asked him to come to his office at the police department. Mr. Smith complied, and the detective presented him with the lineup. He immediately selected Peden's photograph, and identified him as the man Mr. Cooks took on a test drive. Detective Lloyd had Mr. Smith sign and date the back of the photograph to indicate that it was the one he had chosen.
When Mr. Smith left Detective Lloyd's office, the detective telephoned Mr. Cooks and asked him to come to the police department. Detective Lloyd explained that he was conducting a follow-up investigation into the robbery, and he wanted Mr. Cooks to look at a photographic lineup. When Mr. Cooks arrived, the officer went through the same procedure he had followed with Mr. Smith. Detective Lloyd asked him if he recognized anyone in the lineup. Mr. Cooks immediately identified Peden as the man who had robbed him. Mr. Cooks signed and dated the photograph.
Peden argues that the witnesses knew police had arrested a suspect on the day of the lineup, and that that knowledge corrupted the identification procedures. Peden proposes that the witnesses felt pressured to identify someone from the lineup. Mr. Smith testified at trial that he learned on the day he viewed the photographic lineup that the Chrysler had been recovered, and a suspect apprehended. Mr. Smith further testified, however, that he did not discuss that information with Mr. Cooks until after Mr. Cooks had viewed the lineup.
There is nothing in the record to suggest that either Mr. Smith or Mr. Cooks was influenced in his selection. Detective Lloyd testified at the suppression hearing that when he showed the witnesses the lineup, he did not tell them that there was someone in custody whom he believed was responsible for the robbery. Lloyd further testified that he did not offer the witnesses any inducement to identify anyone from the lineup. The detective stated he did not suggest to either witness that Peden was the person arrested in the vehicle.
At trial, Mr. Smith testified that when Detective Lloyd showed him the lineup, he simply asked him whether he recognized any of the photographs. Mr. Cooks testified that the officer asked him whether any of the people in the photographs looked familiar. Both Smith and Cooks testified that no one told him whom to select.
Peden argues the initial police report reflects that the perpetrator was bald, whereas he clearly had hair in May 2002, and at the time of trial. The trial testimony, however, shows that neither witness actually described the perpetrator to the reporting officer as bald. Moreover, Detective Lloyd testified that Officer Fay, the reporting officer, might well have marked "bald/none" under the space for hair color on the report form simply because the witnesses did not tell him the perpetrator's hair color.[15]
Peden complains that the lineup was suggestive because, of the six subjects included, he was the only one pictured with gold teeth. He argues that this drew attention *944 to his photograph, and caused the lineup to be suggestive. The state responds that the lineup was not suggestive, and that Peden did not bring up the difference in the photograph at the motion hearing. Peden's photograph is, in fact, the only one that depicts gold teeth. This is at least partly explained by the fact that he is the only subject pictured with his mouth open. The difference in the photographs was compounded, defendant argues, by the fact that neither witness described the perpetrator as having had gold teeth.
Strict identity of physical characteristics among the individuals depicted in a photographic array is not required; however, the resemblance must be sufficient to reasonably test the identification. Id. The question for a reviewing court is whether the procedure is so conducive to irreparable misidentification that due process was denied.[16]
While it is possible that the witnesses' attention was drawn to Peden's photograph, it seems unlikely that this led to irreparable misidentifications. Aside from the visibility of Peden's gold teeth, his photograph was substantially similar to the others in the lineup. All of the photographs in the array depict African-American males with light mustaches. All are of similar skin complexion. All have short hair, and none of them has a beard.
Peden is correct in his assertion that neither Mr. Smith nor Mr. Cooks told police that the perpetrator had gold teeth. However, they were both able to immediately identify Peden from the lineup and at trial. Mr. Cooks testified that there was no doubt in his mind that Peden was the man who robbed him. Both Mr. Cooks and Mr. Smith had ample opportunity to view and speak with Peden prior to the robbery. Moreover, the identifications were made less than ten days after the offense.
It does not appear that the identification procedure was suggestive, or that it produced a great likelihood of misidentification. This Assignment of Error has no merit.

ASSIGNMENT OF ERROR NUMBER TWO
Peden asserts that he was prejudiced by the trial court's denial of his Motion for Mistrial. He argues that the judge deprived him of his right to aid in his own defense by resuming trial proceedings despite the fact that he was mentally impaired due to pain from a shoulder injury. Peden moves this Court to reverse his convictions.
Peden's trial began on July 16, 2003. In the late afternoon, after the jury had been selected, Deputy Daniel McKenna informed the court that Peden had suffered an injury at the parish prison. The deputy explained that when he went to the prison to escort Peden back to court, Peden complained to him of pain in his left shoulder. A prison nurse examined Peden and found that he had a dislocated shoulder. The nurse informed Deputy McKenna that the injury could not be treated at the prison, and that Peden had to be taken to a hospital. At that point, defense counsel moved for a mistrial.
The prosecutor asked the judge to recess the proceedings until the following day to allow Peden to receive medical treatment. The judge ordered that Peden be treated that night at Charity Hospital in New Orleans, and that he return to court the following morning. The court denied the mistrial motion, and defense counsel objected.
*945 When the court convened on the morning of July 17, 2003, the judge addressed the parties out of the jury's presence:
Yesterday Mr. Peden suffered an injury while he was housed in a cell. That gives me pause, and I am not concerned about Mr. Peden's mental capacity or anything like that, I am concerned about Mr. Peden's danger to others. He is charged with a very serious offense which carries with it a very serious penalty. I am concerned that Mr. Peden might notin an effort not to try this case might not be as calm and collect as one would hope.
Peden explained to the judge that his shoulder was easily dislocated, and that it had become dislocated the day before when he sneezed as he was tying his shoes. Defense counsel then re-urged his mistrial motion, arguing that Peden had only gotten two hours of sleep. Peden did not feel he was able to properly assist counsel because he was in pain.
The judge learned that Peden had been taken to the hospital at 10:00 p.m. the previous night, and had been returned to the prison at 2:40 a.m. He had awoken at 7:00 a.m. The judge found that Peden had had four hours in which to sleep, an adequate amount of time. Peden stated that he had been given a dose of Tylenol III at midnight, and no pain medication after that. Defense counsel agreed that the effects of that medication would have lasted for about four hours. Given that Peden had not had any medication for eleven hours, the judge did not feel that his mind would be clouded so as to prevent him from assisting counsel.
The trial court ruled as follows:
Mr. Peden explained to me, which was very cogently, that his issue with his shoulder is that it goes in and out, so that would not have beenso he explained to me that he had a history of dislocated shoulders, so Mr. Peden has had this experience before, and it would not be unusually frightening so as to cause him not to be able to assist his counsel.
The motion to continueThis case was specially set, and witnesses have been flown in from out of town. The motion to continue is denied.
Peden objected to the court's ruling.
Peden contends he was entitled to a mistrial under LSA-C.Cr.P. art. 775. It should first be considered whether the illness of the defendant is a valid ground for mistrial. Article 775 provides that a mistrial may be granted when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when a legal defect in the proceedings occurs, which would make any judgment entered upon a verdict reversible as a matter of law.
Additionally, Article 775(5) provides a mistrial may be granted when it is physically impossible to proceed with a trial. See, Comment (c)(1) of Article 775, which suggests that physical necessity such as the illness or death of the judge, a juror, or an attorney may constitute sufficient justification for a mistrial. In State v. Delore, 381 So.2d 455, 459 (La.1980), the Louisiana Supreme Court found that a juror who is disabled by illness is "incompetent to serve" under the provisions of LSA-C.Cr.P. art. 796. The court further held that when a juror becomes incompetent during the course of trial, and no alternate is available, Article 775 requires that a mistrial be ordered because it is "physically impossible to proceed." See also, State v. Moten, 510 So.2d 55, 58 (La.App. 1 Cir.1987), writ denied, 514 So.2d 126 (La.1987), in which the Supreme Court found the trial court was justified in granting the State's mistrial *946 motion, where the Assistant District Attorney scheduled to try the case was ill, and there was no prosecutor sufficiently familiar with the case to take his place. Citing subpart (5) of Article 775, the court held that it was physically impossible for the State to proceed under those circumstances. It seems reasonable to infer that, under certain circumstances, the illness of the defendant is a valid ground for mistrial under LSA-C.Cr.P. art. 775(5).
Mistrial is a drastic remedy that is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial.[17] The determination of whether actual prejudice has occurred lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.[18] It does not appear that the trial court abused its discretion in denying a mistrial.
Peden failed to show that he suffered substantial prejudice. When the court was considering Peden's motion on the morning of July 17th, counsel did not produce any medical documentation to demonstrate his incapacity to proceed. Moreover, there is no evidence in the record that his case suffered from the court's refusal to grant a mistrial. Peden even testified at trial after a long day in court. The record tends to show that Peden was alert and coherent at that point.
Peden further argues that, even if he was not entitled to a mistrial, the trial court should at least have "continued" the proceedings for a day or two to allow him time to recover from his injury. Peden's use of the term "continuance" is misplaced. The applicable term for a temporary adjournment of the proceedings after trial has commenced is "recess." LSA-C.Cr.P. art. 708. The court did, in fact, allow a recess on the evening of July 16th in order to allow Peden to seek medical treatment. The judge believed that recess was sufficient, and Peden did not provide the court with any evidence to the contrary. Moreover, he did not move for a recess on July 17th. He specifically requested a mistrial. Moreover, as discussed above, Peden did not provide the court with objective substantiation in support of his argument that he was unable to assist counsel. Based on the foregoing, this Assignment of Error has no merit.

ASSIGNMENT OF ERROR NUMBER FOUR
The Trial Court erred by not putting in the record reasons for its excessive sentence.
By this assignment, Peden argues that his fifty-year habitual offender sentence for armed robbery (count one) is constitutionally excessive, and that the trial court erred in failing to give reasons for said sentence. Peden did not file a Motion to Reconsider Sentence as to either his original or his enhanced sentence. LSA-C.Cr.P. art. 881.1(A)(2). The failure to file a Motion to Reconsider Sentence, or to state the specific grounds on which the motion is based, limits a defendant to a review of the sentence only for constitutional excessiveness.[19]
The Louisiana Supreme Court has held that the applicable sentencing scheme is that which is in effect at the time the *947 offense is committed.[20] Based on the statutory provisions in effect as of May 18, 2002, the date of the offense charged in count one, the trial court was required to impose an habitual offender sentence of at least forty-nine and one-half years. The sentence imposed was only six months greater than the statutory minimum.
The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit imposition of excessive punishment. It is presumed that a mandatory minimum sentence under the Habitual Offender Law is constitutional.[21] The Louisiana Supreme Court has recognized, however, that a mandatory minimum sentence under the Habitual Offender Law may be reviewed for constitutional excessiveness.[22]
A court may depart from the statutory minimum sentence if it finds clear and convincing evidence in the record that rebuts the presumption of constitutionality.[23] The burden is on the defendant to rebut the presumption of constitutionality by showing he is exceptional, i.e., because of unusual circumstances, this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances of each case.[24]
If the trial court finds clear and convincing evidence that justifies a sentence below the mandatory minimum, the court cannot impose whatever sentence it feels is appropriate. Rather, the trial court must impose the longest sentence that is not constitutionally excessive.[25] The Supreme Court has cautioned that downward departures from mandatory sentences should only be made in rare cases.[26]
Peden did not attempt to demonstrate to the sentencing judge any exceptional circumstances to support a departure from the statutory minimum sentence. In fact, he did not make any argument in the district court with regard to downward departure in sentencing. In any case, Peden's criminal record justifies the sentence imposed.
Prior to imposing the original sentence of fifty years on count one, the trial judge noted that Peden, who was only age twenty-three at the time of sentencing, had prior armed robbery convictions and he also had convictions for purse snatching and attempted first degree robbery. The judge further noted that Peden committed the instant robbery only thirty-one days after having been released from prison on a prior offense. Peden is clearly a chronic offender. As such, the judge felt he was a danger to society.
The trial judge did not err in imposing a fifty-year habitual offender sentence. This Assignment of Error has no merit.

*948 ERRORS PATENT DISCUSSION

The record was reviewed for errors patent.[27] The following matter was found.
Peden's convictions both for armed robbery and for the possession of the car taken in the robbery represent a violation of double jeopardy. Neither defendant nor the State raises the issue on appeal. The Double Jeopardy Clauses of the federal and Louisiana constitutions not only prohibit successive trials for the same offense, but also protect against multiple punishments for the same offense.[28]
LSA-C.Cr.P. art. 482(A) provides:
An indictment for theft may also contain a count for receiving stolen things, and the defendant may be convicted for either offense. When two or more persons are jointly indicted for these offenses, any or all of the persons indicted may be found guilty of either of the offenses charged. The district attorney shall not be required to elect between the two offenses charged.
In State v. Robertson, 386 So.2d 906, 908 (La.1980), the Supreme Court found that Article 482 applies not only where a defendant is charged with theft, but also where the defendant is charged with a crime of which theft is an essential element.[29]Charging a defendant with theft, or a crime of which theft is an essential element, and receiving stolen things, is not in itself a violation of double jeopardy. Rather, the jury must choose between the two counts and convict on only one count or the other. The defendant cannot be found guilty of both offenses.[30] The purpose behind the article is to ensure that there is a single prosecution resulting in an acquittal or a single conviction for theft or receiving stolen things. State v. Williams, 359 So.2d 115, 117 (La. 1978).
In the instant case, the judge failed to instruct the jury that it could only convict defendant of one offense or the other, but not both. Further, no objection was made to the jury instructions. Because the defendant could not be convicted of both theft and illegal possession of stolen things, corrective action is required.
In State v. Bruce[31], the defendant was tried by a jury and convicted of theft and receiving stolen property. The property involved in both offenses was an automobile. The victim saw the defendant take his car from the parking lot of his (the victim's) place of employment. The victim's employer apprehended the defendant as he was driving away from the premises in the car. Defendant appealed his convictions, challenging the sufficiency of the evidence.
Although the defendant did not raise the issue on appeal, the State conceded as part of its error patent discussion[32] that the *949 defendant's convictions for both offenses could not stand under LSA-C.Cr.P. art. 482. The State moved this Court to vacate the conviction and sentence for possession of stolen goods, and to leave intact the defendant's conviction and sentence for theft. This Court vacated the conviction for possession of stolen goods, citing comment (a) of Article 482, which provides, "`A receiver of stolen things (R.S. 14:69) will be guilty of theft (R.S. 14:67), rather than receiving, if it develops that he procured or in any way participated in the stealing of the goods.'"[33]
In State v. Norman, 34,868, p. 5 (La.App. 2 Cir. 10/31/01), 799 So.2d 619, 622, the Second Circuit arrived at a different procedural outcome based on facts similar to those in Bruce. That court held that in finding the defendant guilty of both theft and illegal possession of stolen goods, the jury had rendered illegal verdicts. The court further held that in such cases, it is as if the jury failed to reach a decision. Id. at 623. The Norman court vacated both of the defendant's convictions and sentences, and remanded the case for a new trial. Citing State v. Mayeux, 498 So.2d 701, 705 (1986), the court found that double jeopardy does not preclude the State from retrying a defendant whose conviction is set aside because of a judicial error. When a jury renders an illegal verdict, the Fifth Amendment does not bar retrial. Id.
Based on this Court's holding in State v. Bruce, supra, defendant's conviction and sentence for possession of stolen goods are vacated. The armed robbery conviction and sentence are affirmed. Comment (a) of Article 482 seems more persuasive authority than the Second Circuit's assertion that concurrent convictions for theft and possession of stolen goods are essentially null and void. Moreover, it noteworthy that the Louisiana Supreme Court denied writs in Bruce, whereas it did not have occasion to pass on the Second Circuit's holding in Norman.
Accordingly, defendant's conviction and sentence for armed robbery are affirmed. Defendant's conviction and sentence for possession of stolen things are vacated.
AFFIRMED IN PART, VACATED IN PART.
NOTES
[1] The State dismissed count two of the Bill of Information on August 6, 2003.
[2] The fact that defendant was convicted of both armed robbery and possession of the property taken in the armed robbery presents a reversible double jeopardy problem. See discussion under errors patent review, post.
[3] State v. George, 95-0110, p. 6 (La.10/16/95), 661 So.2d 975, 978; State v. Conner, 02-363, p. 7 (La.App. 5 Cir. 11/13/02), 833 So.2d 396, 401, writ denied, 02-3064 (La.4/25/03), 842 So.2d 396.
[4] 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
[5] State v. Juluke, 98-0341 (La. 1/8/99), 725 So.2d 1291; State v. Williams, 99-223, p. 6 (La.App. 5 Cir. 6/30/99), 742 So.2d 604, 607.
[6] LSA-R.S. 14:69; State v. Brooks, 01-1073 (La.App. 5 Cir. 2/26/02), 811 So.2d 1066, 1069.
[7] State v. Billard, 03-319, p. 5 (La.App. 5 Cir. 7/29/03), 852 So.2d 1069, 1072, writ denied, 03-2437 (La.2/6/04), 865 So.2d 739.
[8] Although defense counsel referred to Fay's report at trial, it was not admitted in evidence.
[9] State v. Tapps, 02-0547, p. 10 (La.App. 5 Cir. 10/29/02), 832 So.2d 995, 1001, writ denied, 02-2921 (La.4/21/03), 841 So.2d 789.
[10] Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977).
[11] Id.
[12] State v. Bright, 98-0398, p. 17 (La.4/11/00), 776 So.2d 1134, 1143.
[13] State v. Bright, 98-0398 at p. 18, 776 So.2d at 1145.
[14] State v. Davis, 02-1008, p. 6 (La.App. 5 Cir. 2/25/03), 841 So.2d 952, writ denied, 03-0948 (La.11/7/03), 857 So.2d 516.
[15] See discussion under Assignment of Error Number Three, above.
[16] Manson v. Brathwaite, 432 U.S. at 116, 97 S.Ct. at 2254; State v. Bright, supra.
[17] State v. Clark, 02-1463, p. 31 (La.6/27/03), 851 So.2d 1055, 1079, cert. denied, ___ U.S. ___, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004).
[18] Id.
[19] State v. Dupre, 03-256, p. 7 (La.App. 5 Cir. 5/28/03), 848 So.2d 149, 153A Writ Application was filed in the Louisiana Supreme Court (No.2003-KO-1978) on July 11, 2003. As of this writing, there is no writ disposition.
[20] State v. Sugasti, 01-3407, p. 5 (La.6/21/02), 820 So.2d 518, 521.
[21] State v. Johnson, 97-1906, p. 6 (La.3/4/98), 709 So.2d 672, 676; State v. Dupre, 03-256 at p. 8, 848 So.2d at 153.
[22] State v. Johnson, supra.
[23] Id.; State v. Harbor, 01-1261, p. 5 (La.App. 5 Cir. 4/10/02), 817 So.2d 223, 226, writ denied, 02-1489 (La.5/9/03), 843 So.2d 388.
[24] Johnson, supra.
[25] State v. Johnson, 97-1906 at p. 8, 709 So.2d at 677; State v. Simmons, 02-960, p. 6 (La.App. 5 Cir. 1/28/03), 839 So.2d 239, 244, writ denied, 03-0841 (La.10/31/03), 857 So.2d 473.
[26] State v. Johnson, 97-1906 at p. 8, 709 So.2d at 676-677.
[27] LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
[28] North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). See also, State v. Murray, 00-1258, p. 3 (La.9/18/01), 799 So.2d 453, 455.
[29] "[W]e conclude that where a defendant is charged in separate indictments with theft, or a crime in which theft is an essential element thereof (e.g., armed robbery), and receiving stolen things, and the object of the theft and the thing received are the same, a defendant can be found guilty of either crime but not both." Robertson, 386 So.2d at 908.
[30] State v. Robertson, supra; State v. Britton, 443 So.2d 6, 7(La.App. 5 Cir.1983).
[31] 556 So.2d 129 (La.App. 5 Cir.1990), writ denied, 561 So.2d 114 (La.1990).
[32] It appears that the Louisiana Supreme Court sanctioned the recognition of double jeopardy as a patent error in State ex rel. Adams v. Butler, 558 So.2d 552, 553, fn. 1 (La.1990).
[33] State v. Bruce, 556 So.2d at 131