**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**23-348**

**STATE OF LOUISIANA**

**VERSUS**

**GERALD LYNN ARTIS**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, 2019-0348
HONORABLE E. DAVID DESHOTELS, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**CHARLES G. FITZGERALD**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Van H. Kyzar, Jonathan W. Perry, and Charles G. Fitzgerald, Judges.

**AFFIRMED.**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**600 Jefferson Street, Suite 903**
**Lafayette, Louisiana 70501**
**(337) 366-8994**
**Counsel for Defendant/Appellant:**
    **Gerald Lynn Artis**

**Jeff M. Landry**
**Attorney General**
**Christopher N. Walters**
**Grant L. Willis**
**Assistant Attorneys General**
**Post Office Box 94005**
**Baton Rouge, Louisiana 70804-9005**
**(225) 326-6200**
**Counsel for Appellee:**
    **State of Louisiana**

**FITZGERALD, Judge.**

Gerald Lynn Artis (Defendant) appeals his convictions and sentences for armed robbery and aggravated second degree battery.

## PROCEDURAL HISTORY

In December 2018, Truman Doyle was beaten and robbed after leaving the Coushatta Casino in Kinder, Louisiana. Defendant and three accomplices were ultimately arrested. Defendant, in particular, was charged with one count of armed robbery in violation of La.R.S. 14:64 and one count of aggravated second degree battery in violation of La.R.S. 14:34.7.

Defendant, in turn, filed a motion to sever trial which was granted. Defendant then moved to suppress evidence, but this motion was denied.

The matter proceeded to jury trial in November 2022. At the close of evidence, the jury unanimously found Defendant guilty as charged. A few weeks later, Defendant moved for a new trial. This motion was denied before the imposition of sentence.

In February 2023, the trial court sentenced Defendant to twenty-seven years at hard labor without the benefit of parole, probation, or suspension of sentence for armed robbery and ten years at hard labor for aggravated second degree battery. The sentences were ordered to run concurrently. Defendant now appeals his convictions and sentences.

On appeal, Defendant asserts two assignments of error:

1. The State failed to sufficiently prove that [Defendant] was guilty of Armed Robbery and Aggravated Second Degree Battery.

2. The trial court erred in denying the motion to suppress evidence seized during the arrest of [Defendant], as his arrest was accomplished by using an illegal "ping" of his cellphone to determine his location, which constituted a warrantless search.

The State's use of an emergency ping through the phone company was not justified under the facts of this case. Thus, the evidence should have been suppressed. The Court further erred in not granting a motion for a new trial based on the same erroneous ruling.

## LAW AND ANALYSIS

### I.      Errors Patent

Pursuant to La.Code Crim.P. art. 920, we find no errors patent on the face of the record.

### II.      Assignment of Error Number 1

Defendant contends that there was insufficient evidence to prove his identity as the perpetrator of the armed robbery and aggravated second degree battery committed against the victim: there was no forensic evidence tying him to the scene of the crime and no identification of him by the victim.

The State, on the other hand, argues as follows:

> This case presents a straightforward criminal prosecution in which the State presented to the jury numerous surveillance camera videos, physical evidence, and multiple witnesses, including several co-defendants who were present and witnessed Defendant [Artis] strike the victim twice in the back of the head with a four-way tire iron and then take the victim's wallet before leaving the victim for dead in a roadside ditch.

### A.      *Standard of Review*

A sufficiency of the evidence claim is reviewed on appeal under the standard set forth by *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). In that case, the United States Supreme Court explained that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis in original).

2

Commenting on *Jackson*, the Louisiana Supreme Court cautioned that "[t]his standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521. Put simply, a reviewing court must afford great deference to a jury's decision to accept or reject the testimony. *State v. Allen*, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct. 1404 (2004). "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *Id*. at 626.

And importantly, when the key issue in a case is the defendant's identity, "the State is required to negate any reasonable probability of misidentification." *State v. Hughes*, 05-992, p. 5 (La. 11/29/06), 943 So.2d 1047, 1051 (citing *State v. Weary,* 03-3067 (La. 4/24/06), 931 So.2d 297, *cert. denied*, 549 U.S. 1062, 127 S.Ct. 682 (2006); *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649, *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002)). "Positive identification by only one witness is sufficient to support a conviction. It is the factfinder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations." *Id.* (citations omitted).

### B. *Summary of the Trial Evidence*

Detective Scotty Paul, formerly with the Allen Parish Sheriff's Department, was assigned to investigate the incident. Oversimplifying slightly, Detective Paul testified that on the night of December 9, 2018, Defendant and Leah Langley arrived together in Leah's car at the Coushatta Casino; that in the early morning hours of

3

December 10, Leah and the victim left the casino together in the victim's truck; that unbeknownst to the victim, Defendant was following them in Leah's vehicle; that soon thereafter, Leah picked up her niece, Jennifer Buffalohead; that at this same time, Defendant picked up Jennifer's boyfriend, Craig Fife; that Defendant then resumed following the victim's truck; that at some point thereafter, both vehicles came to a stop; that the victim then exited his truck and was hit in the back of the head with a tire iron; that the victim's wallet containing approximately $2,000.00 was taken from his person; that the victim was left for dead in a ditch; and that Defendant and his three accomplices committed these criminal acts.

Video recordings were admitted into evidence in conjunction with Detective Paul's testimony. The video footage shows Defendant and Leah arriving together at the casino on the evening of December 9, 2018. Several hours later, at 1:49 a.m., the footage shows Defendant and Leah walking behind the victim. Ten minutes later, it shows the victim with his arm around Leah. And ten minutes after that, it shows Leah talking to Defendant and then returning to the victim. The video footage at 3:03 a.m. shows Leah walking up to Defendant at one of the casino bars. She grabs two drinks and walks back to the victim.

By 3:48 a.m., the video footage shows the victim stumbling. Two minutes later, it shows Leah having an animated conversation with Defendant at the bar. And by 4:07 a.m., the footage shows the victim and Leah leaving the casino after the victim appears to cash out his winnings. The footage shows them getting into the victim's truck: Leah is the driver, and the victim is the passenger. And at the same time, it shows Defendant leaving the casino in Leah's vehicle.

At 4:18 a.m., the video footage shows the victim's truck arriving at Feather Fuel gas station. Leah and the victim exit the truck and go inside the gas station.

4

Three minutes later, Defendant arrives at Feather Fuel.  Defendant eventually pulls up next to a gas pump.  Twenty-two minutes later, the footage shows Leah and the victim leaving the gas station, heading north on U.S. Highway 165 with Defendant following closely behind them.

Turning now to the testimony of the three accomplices.  Leah, who was admittedly given immunity for her testimony, explained to the jury that she and Defendant drove her car to the casino on the night of December 9, 2018.  She and Defendant observed the victim at one of the slot machines, and Defendant encouraged her to have a drink with the victim.  Leah explained that she sat with the victim and consumed drinks with him while he played on the machine.

Leah then admitted leaving the casino with the victim, driving his truck, being followed by Defendant, and then picking up her niece, Jennifer.  As to what happened next, Leah testified as follows:

> We took off and then we—the road is like you keep going down the road there is a stop sign we took a left, and it—the road curves back this way.  So, we followed that road and then I noticed that my car was trying to stop us.  Jennifer was driving so we go up a little ways and then she stops.  And when she stops[, Craig,] who was in my car, he gets out and goes over to her on the driver's side.  And asked what she was doing, what was going on, you know he was confused about what was suppose to be taking place.  So, then they kind of get into an argument, and then she gets out.  Because she gets out then I get out and get into the driver's side and then I put the truck in drive.  I drove just a little ways, and then I stopped because I'm confused about what's suppose to be happening with—what's going on.  So, I stop and I get out and then I go to my car which is behind us, and that's whenever I go and I ask [Defendant to] roll[] down the window.  And I ask what are we suppose to be doing with –what is you know going on?  And then from there [Defendant] tells [Craig] to get out and start some kind of conflict or you know conversation[] . . . with [the victim].  So, [Craig] is reluctant to do that but he got out anyway and while he was having words with [the victim].  [Defendant] gets out of the driver[']s side of my car, I get in the driver's side, so he proceeds to go to [the victim's] truck.  He climbs in the back of the truck, and gets something in his hand.  And then he climbs back out of the back of truck, and goes around the driver side of the truck and goes through the front, comes

around, and comes back up so [the victim] can't see him. And then he hits [the victim] in the head not once but two times.

As Leah recalled, the victim fell to the ground unconscious. She testified that this was when she saw Defendant take the victim's wallet from his person. Defendant then drove the victim's truck down the road and wiped the steering wheel.

During cross-examination, Leah admitted receiving some of the stolen money. She also admitted that her trial testimony differed somewhat from her original statement to police, explaining that she was scared, shocked, and confused when she made that statement. Leah then emphasized that her court testimony was the entire truth.

Leah's niece, Jennifer, was also called by the State. Like Leah, Jennifer admitted that her trial testimony differed from her original police statement in which she denied seeing anything. She explained that at the time of her original statement, she was afraid and under the influence of drugs. She then explained that on the night in question, she and Leah exchanged text messages about robbing the victim. She confirmed that Leah and the victim picked her up in the victim's truck. She confirmed that her then-boyfriend, Craig, and Defendant were following them in Leah's car. Jennifer recalled that when both vehicles came to a stop, she exited the truck and got into the other vehicle. She testified that this is when Defendant told Craig "[t]o basically go distract [the victim]."

Jennifer testified that she saw Defendant strike the victim from behind with the tire tool—not once but twice, that she saw the victim stumble to the ground, and that she saw Defendant take the victim's wallet from his person. Like Leah, Jennifer admitted receiving some of the stolen funds. But unlike Leah, Jennifer did not receive immunity for her testimony; she pleaded guilty to a reduced charge of simple

robbery for her role in this incident. According to Jennifer, her charges were not reduced in exchange for her testimony.

The third accomplice, Craig, was dating Jennifer at the time of the incident. Craig testified that he watched Defendant strike the victim twice in the back of the head with a "four[-]way tire tool." He also testified that he saw Defendant take the victim's wallet from his person. And like Jennifer, Craig explained that his charges were not reduced in exchange for his testimony. Indeed, Craig pleaded guilty to armed robbery and aggravated second degree battery for his role in this event.

Several other witnesses were called by the State, including the victim, other police officers, Defendant's former girlfriend, and several experts. Text messages and real evidence, including the tire iron and the victim's DNA, were also admitted at trial.

### C. *Aggravated Second Degree Battery—Sufficiency of the Evidence*

A "battery" is defined as "the intentional use of force or violence upon the person of another[.]" La.R.S. 14:33. More particularly, an "aggravated second degree battery" is defined as "a battery committed with a dangerous weapon when the offender intentionally inflicts serious bodily injury." La.R.S. 14:34.7(A).

Defendant here does not argue that the State failed to establish any of the essential statutory elements of this crime. Rather, he argues that the State failed to prove beyond a reasonable doubt his identity as the perpetrator.

As a matter of law, the State is required to prove Defendant's identity as the perpetrator. *State v. Draughn*, 05-1825 (La. 1/17/07), 950 So.2d 583, *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007). In *State v. Holmes*, 05-1248, pp. 8–9 (La.App. 4 Cir. 5/10/06), 931 So.2d 1157, 1162, the fourth circuit explained as follows:

7

When a key issue at trial is whether the defendant was the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof beyond a reasonable doubt. *State v. Bright,* 1998-0398 (La.4/11/00); 776 So.2d 1134, 1147. The fact-finder weighs the respective credibilities of the witnesses, and a reviewing court will generally not second-guess those determinations. *State ex rel. Graffagnino v. King,* 436 So.2d 559 (La.1983). However, the touchstone of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)[,] is rationality and that "irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). The trier of fact makes credibility determinations, and may, within the bounds of rationality, accept or reject the testimony of any witnesses. *State v. Hampton,* 98-0331 (La.4/23/99); 750 So.2d 867, 880.

Thus, for this court to affirm Defendant's conviction, we must determine whether, in viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that Defendant knowingly struck the victim with a tire iron on December 10, 2018.

In *State v. Higgins*, 03-1980, p. 6 (La. 4/1/05), 898 So.2d 1219, 1226, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005), the Louisiana Supreme Court noted that "in the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion."

Here, multiple eyewitnesses testified against Defendant. And while Leah received immunity for her testimony, Jennifer and Craig did not receive any sort of plea agreement for their testimony. The jury was made aware of these facts, and defense counsel questioned Leah, Jennifer, and Craig about their credibility. And in the end, the jury chose to believe their testimony about Defendant's involvement in this event.

Put simply, all three accomplices identified Defendant at trial. All three testified that they saw Defendant strike the victim twice in the back of the head with a tire iron. And all three provided details and facts about the incident that matched the other evidence adduced at trial, including the testimony of other witnesses, the video recordings, and the text messages.

As summarized by the supreme court in *State v. Neal*, 796 So.2d at 658–59 (citations omitted):

> [T]he jurisprudence in Louisiana generally holds that an accomplice is qualified to testify against a co-perpetrator even if the prosecution offers him inducements to testify; such inducements would merely affect the witness's credibility. As the United States Fifth Circuit has found, "a conviction may be based even on uncorroborated testimony of an accomplice or of someone making a plea bargain with the government, provided that the testimony is not incredible or otherwise insubstantial on its face." *United States v. Osum*, 943 F.2d 1394, 1405 (5th Cir.1991).

Based on the above, we conclude that a rational trier of fact could have found proof beyond a reasonable doubt that Defendant was guilty of the crime of aggravated second degree battery. It was the jury's prerogative to assess the credibility of the witnesses and to accept or reject their testimony. We will not second guess the jury's credibility determinations nor will we impinge on its role as fact finder. Accordingly, Defendant's conviction for this offense is affirmed.

### D. *Armed Robbery—Sufficiency of the Evidence*

"Armed robbery" is defined as "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon." La.R.S. 14:64(A). In addition, La.R.S. 14:64(B) states in relevant part that "[w]hoever commits the crime of armed robbery shall be imprisoned at hard labor for not less

than ten years and for not more than ninety-nine years, without benefit of parole, probation, or suspension of sentence."

Once again, Defendant does not argue that the State failed to establish any of the essential statutory elements of this crime; he argues that the State failed to prove beyond a reasonable doubt his identity as the perpetrator. Yet all three accomplices testified that Defendant hit the victim with a tire iron and then took his wallet. And the victim testified that he had approximately $2,000.00 in his wallet when it was taken from his person.

For the reasons given in our previous discussion as to the sufficiency of evidence for the aggravated second degree battery conviction, we conclude that a rational trier of fact could have found proof beyond a reasonable doubt that Defendant was guilty of the crime of armed robbery. Thus, Defendant's conviction for this offense is also affirmed.

### III. Assignment of Error Number 2

Defendant asserts that the trial court erred by denying his pre-trial motion to suppress evidence obtained from a warrantless search of his cellphone location. Defendant also contends that the trial court erred in denying his motion for new trial premised on the same argument. We review this assignment for abuse of discretion. *State v. Adams*, 22-271 (La.App. 5 Cir. 5/10/23), 364 So.3d 1272.

The hearing on Defendant's motion to suppress was held in April 2022. At the hearing, the State and Defendant stipulated that the Allen Parish Sheriff's Office applied for an emergency cell ping on December 12, 2018; that upon obtaining the ping, the detectives learned that Defendant was in Alexandria; and that Defendant was ultimately arrested by the Rapides Parish Sheriff's Office that same day.

10

Several witnesses then testified, including Detective Gregory Quirk, who was the chief of detectives at the Allen Parish Sheriff's Office in December 2018. Detective Quirk explained that he investigated the December 10, 2018 incident, and that he had arrested three of the four suspects: Defendant remained at large. According to Detective Quirk, even though there was probable cause to arrest Defendant, they were unable to find him. When asked about the exigency of the situation, the detective explained:

> Well, an emergency ping is a ping that is done, basically, for a location of a fugitive wanted in a crime. The nature of this crime was a robbery, elderly abused person, aggravated battery committed to injuries—he was in ICU. His life was—didn't know if he was gonna make it. So, it warranted enough to at least make the attempt to do an emergency ping.

Detective Quirk then explained why his department did not first apply for a search warrant:

> [W]e did not because every phone carrier division has a law enforcement division. If you think there is a life and death situation to the public or anything—public—then we can make a call to their law enforcement division of the phone carrier and ask them, give them the circumstances of a case, and ask them to do an emergency ping for a location of the suspect that we are looking for. And they are either gonna grant it—they are gonna grant with the facts that it is enough to warrant the emergency ping, or they are not. And if they are not, then the next step would be to apply for the search warrant, but the chances —if you don't have enough for the emergency ping then your chances of applying with search warrant is gonna be slim also.

Detective Quirk further explained that since the other suspects showed Defendant was involved in the crime, Defendant could be a risk to the public. The only intent behind the emergency ping, according to Detective Quirk, was to locate the person of Defendant.

Detective Paul testified next. When asked if it was important to locate Defendant, Detective Paul replied: "Due to the seriousness of the crime, yes."

11

Detective Paul testified that he was concerned for the public's safety and Defendant's safety. According to the detective, the emergency ping was good for twenty-four hours. If the phone company approves the emergency ping, "they email you a GPS location basically every fifteen minutes when the phone pings and it shows you a location."

Detective Paul explained that they received a location for Defendant within thirty minutes of the cellphone company's approval of their request. Upon learning that Defendant was in Alexandria, the detective contacted the Rapides Parish Sheriff's Office and faxed the arrest warrant to them. When asked if he was trying to obtain other information from Defendant's cellphone, Detective Paul answered: "No. I was just trying to locate him to get the arrest warrant served." Defendant was ultimately found, arrested, and booked into the Rapides Parish Detention Center. Later, he was transported back to Allen Parish.

According to Detective Paul, three cellphones were seized when Defendant was arrested. These phones were right beside Defendant at the time of his arrest. The detective did not search the phones until the search warrants were obtained.

After hearing the evidence, the trial court denied the motion to suppress for the following reasons:

> In the Court's opinion once this horrible crime occurred, the police investigation went to the casino, they found video tape that shows Ms. Leah Langley with the defendant in this case, Mr. Gerald Artis. Upon talking to—initially talking to Ms. Langley, my appreciation is that her rights were read to her. She immediately or soon thereafter implicated co-defendant, Mr. Artis. Based on that information the warrants were presented to the judge at the time, which was Judge Davis, who was the judge in 2018, who signed pretty much all of these warrants . . . . But in my opinion, in the Court's opinion, once that warrant for the arrest of Mr. Artis was signed, that was the game changer. Now it is an attempt to locate Mr. Artis. In a situation where the victim in this case, Mr. Doyle, is hanging on, you know, for his life, and may or may not make it. But once the arrest warrant was signed, based on probable

cause, abundant probable cause, then in my opinion Mr. Artis or defendant would lose some of that expectation of privacy that the Fourth Amendment talks about. The Fourth Amendment, it talks about people having a right to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall be issued upon probable cause, supported by oath or affirmation, particularly describing a person that is to be searched or the person or things to be seized. So, the police officer, the search was for the defendant, for Mr. Artis, not for communications, communications that may have been revealed through the phone, through these phones. Also, kind of as an abundance of precaution before they seized Mr. Artis, went through the trouble in Rapides Parish of obtaining a search warrant to go in or enter into the house, which I think was a good move there as well. Once Mr. Artis was seized and the cell phones were seized then other search warrants were obtained based on probable cause to look for the communications that may exist[] in those cell phones. In the Court's opinion the police did a good job being cautious [by] applying for multiple, multiple search warrants in this case. Additionally the court will make a comment, now days everybody has got a cell phone in their pocket. To think that we are hiding in this society, people know where we are. Find a friend is available. Jealous spouses know where their spouses, other spouses are. You have got parents who know where their children are. No telling how many people know where we are when we have these cell phones in our pockets. And that is new technology is changing every day. People are losing expectations of privacy by holding and carrying these phones with us everywhere we go. So, at least our locations may be available. I still appreciate that we are protected in what is in our phones, the constitution protects that. But our locations[, it's] getting to where everybody knows where we are. And the Court does take that into consideration as well. Finally, Mr. Doyle so badly beaten in the hospital, there is an emergency situation to try to find Mr. Artis. The Court does not neglect that as well. So, for those reasons the Court denies the Motion to Suppress, not only to suppress the immediate cell phones that were seized, but any fruits of the poisonous tree. Making additional comment that additional search warrants were applied for and obtained to get those cell phone dumps.[1]

On appeal, Defendant points to *Carpenter v. United States*, 585 U.S. ----, 138 S.Ct. 2206 (2018), arguing that he "had a Fourth Amendment expectation of privacy in his private cell-site location information[.]" And instead of securing a search warrant, "the police sought to use the 'exigent circumstances' exception to the

---

[1] In January 2023, the trial court denied Defendant's motion for new trial which was based on the same argument.

Stored Communications Act, 18 U.S.C. § 2701 et seq., simply because it was more expedient." But the State failed to prove exigent circumstances for the cellphone ping since there was no showing that he was committing or going to commit another crime and no showing that he was a danger to himself or others. This is Defendant's argument.

The State disagrees, contending that the trial court correctly found the existence of exigent circumstances. After all, the "ping" was requested and used by police less than forty-eight hours after the victim was viciously attacked, robbed, and left for dead; the victim was in ICU and his survival was in question, making a homicide charge possible; the investigation indicated that Defendant was the "ring leader" in the crime; there was evidence that Defendant was fleeing from authorities; the police knew that Defendant had a prior criminal history; and the request for the "ping" was limited in time and scope.

In *State v. Isaac*, 17-87, pp. 12–13 (La. App. 5 Cir. 10/25/17), 229 So.3d 1030, 1040–41, *writ denied*, 17-2106 (La. 6/15/18), 257 So.3d 679, the fifth circuit analyzed when exigent circumstances exist:

> Exigent circumstances have been described as an "emergency or dangerous situation" and as circumstances "in which police action literally must be 'now or never' to preserve the evidence of the crime." *Payton v. New York*, 445 U.S. 573, 583, 100 S.Ct. 1371, 1378, 63 L.Ed.2d 639 (1980); *Roaden v. Kentucky*, 413 U.S. 496, 505, 93 S.Ct. 2796, 2802, 37 L.Ed.2d 757 (1973). Exigent circumstances may arise from the need to prevent the offender's escape, to minimize the possibility of a violent confrontation which could cause injury to the officers and the public, and to preserve evidence from destruction or concealment. *State v. Brisban*, 00-3437 (La. 2/26/02), 809 So.2d 923. "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967); *Riley v. California*, [573] U.S. [373], 134 S.Ct. 2473, 2494, 189 L.Ed.2d 430 (2014).

In our view, the trial court did not err in finding that exigent circumstances justified the warrantless procurement of Defendant's cell-site information. Defendant was attempting to flee from the investigation of this violent crime, creating an exigency to preserve evidence and protect the public. In addition, the scope of the information sought and obtained by police was limited to Defendant's location. The police received the "ping" location to execute a valid arrest warrant, not to obtain other information.

In the end, the trial court did not abuse its discretion in denying Defendant's motion to suppress. Nor did the trial court abuse its discretion in denying Defendant's motion for new trial. This assignment is therefore without merit.

## DISPOSITION

For the above reasons, Defendant's convictions and sentences are affirmed.

**AFFIRMED.**